14 P.3d 773 (2000)
101 Wash.App. 750
Bruce J. MORGAN, DPM, Appellant,
v.
PEACEHEALTH, INC., Respondent.
No. 43467-5-I.
Court of Appeals of Washington, Division 1.
April 17, 2000.
Reconsideration Denied and Publication Ordered July 19, 2000.
*776 Jay D. O'Sullivan, Seattle, for Appellant.
William R. Hickman, Katharine W. Brindley, Marilee C. Erickson, Reed McClure, Seattle, for Respondent. *774
*775 WEBSTER, J.
After St. John Medical Center, owned and operated by Respondent PeaceHealth, revoked Appellant Bruce J. Morgan's hospital privileges, he brought suit against Peace Health alleging that PeaceHealth's actions against him were in violation of: (1) the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11101, et seq.; (2) the Washington Health Care Peer Act, RCW 7.71.030; (3) the Consumer Protection Act (CPA), RCW Ch. 19.86; (4) and article 12, § 22 of the Washington Constitution. The trial court granted summary judgment to PeaceHealth.
The issues presented by Morgan's appeal are: (1) is PeaceHealth entitled to immunity under the HCQIA; (2) did the trial court abuse its discretion by denying Morgan's motions to compel discovery and continue until discovery was answered; (3) did the trial court abuse its discretion by refusing to strike portions of a declaration and certain attached documents offered in support of PeaceHealth's motion for summary judgment; (4) is Morgan entitled to injunctive relief; and (5) is the Hospital entitled to attorney fees? Because we find that the hospital is entitled to immunity, we affirm.

SUMMARY JUDGMENT STANDARD
"When reviewing an order for summary judgment, we engage in the same inquiry as the trial court, and will affirm summary judgment if there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." Wilson Court Ltd. Partnership v. Tony Maroni's, Inc., 134 Wash.2d 692, 698, 952 P.2d 590 (1998); see also CR 56(c). All facts and reasonable inferences must be considered in a light most favorable to the nonmoving party, and all questions of law are reviewed de novo. See id. We will sustain the trial court's judgment on any theory established in the pleadings and supported by proof. See id.

BACKGROUND
A. The Parties
Morgan is a podiatrist who had staff privileges at St. John Medical Center and Monticello Medical Center from 1981 to 1997. Respondent PeaceHealth owns St. John Medical Center. Prior to 1987, St. John and then independent Monticello Medical Center had a joint credentials committee. After Peace Health acquired Monticello in 1987, the joint credentials committee became the Credentials Committee.
B. The Evidence Regarding the 1981 and 1983 Complaints and Actions Taken by the Hospital
In support of its motion for summary judgment, PeaceHealth offered the declaration of Betsy A. Coburn, St. John's Risk Manager. *777 Coburn's responsibilities include monitoring the credentials and peer review actions at the hospital. Coburn has held this position since July 1989. Coburn testified in her declaration to alleged complaints against Morgan made in 1981 and 1983, before she held her position, and actions taken by Monticello Medical Center:
In 1981 and 1983, the joint Credentials Committee received a number of complaints regarding inappropriate sexual behavior, unprofessional conduct, and possible negligence by Dr. Morgan. In 1983, Dr. Morgan's privileges were summarily suspended due to complaints by patients of incompetence and inappropriate sexual behavior. His privileges were restored under the conditions that he would be accompanied by a nurse during his patient rounds and that he would seek professional help for his personality problems. In addition, Dr. Morgan was warned that if other instances of unprofessional conduct occurred, his privileges would be revoked.
CP at 11. Attached to the declaration is a redacted document pertaining to Morgan, apparently from the combined credentials committee but labeled "MONTICELLO MEDICAL CENTER ONLY." CP at 54-55. This document was not a part of Morgan's St. John peer review file; it was a part of Monticello's records. See CP at 197. The document is not dated and not signed. CP at 54-55. The unredacted portion of the document refers to complaints by Morgan's patients but does not describe the complaints or indicate the type of the complaints. CP at 54. The conditions to which Coburn refers are listed:
The recommendation [of] the Executive Committee is as follows:
* That Dr. Morgan be accompanied by a nurse on his hospital rounds
* That Dr. Morgan have his nurse present during patient exams in his office
* That Dr. Morgan seek professional counseling for his personality problem
* That Dr. Morgan meet with the Executive Committee in 3 months to discuss the steps he has taken with regard to his problem
* That if any other incidents occur of similar nature, it will be recommended that his privileges be totally and permanently suspended.
CP at 54-55.
C. The Evidence Concerning 1994 Complaints and Actions Taken by the Hospital
A meeting summary, dated November 9, 1994, which is unsigned but apparently authored by Dr. Frank Marre, documents a meeting Marre had with two female hospital employees who complained about Morgan's behavior in the operating room. CP at 315. One of the employees complained that Morgan frequently draws sexual inferences in the operating room, that he once bent forward and kissed her on the top of her head, and that he has made gestures as if handling her breasts when he puts on his gown. CP at 315. Morgan had not actually touched her breasts. CP at 315. The other woman confirmed Morgan's behavior. CP at 315. The employees were adamant that Morgan receive oral warning but preferred that the staff not take more aggressive action. CP at 315.
A letter to Morgan, signed by both Frank Marre, Assistant Administrator for Medical Affairs, and Jim Reisner, President of the Medical staff, dated November 16, 1994, documents a meeting on that day between these individuals and Morgan. CP at 57. Also in attendance at the meeting was George S. Fortner, Vice President of the Medical Staff. The letter documents that Morgan had been informed that complainants alleged that he had engaged in sexually suggestive comments, inappropriate touching, and unwanted advances. CP at 57. Morgan was advised that the behavior was objectionable, was creating a hostile work environment, and was in violation of hospital policy and federal law. CP at 57. Morgan was warned that any further occurrence would result in "investigative action and/or summary suspension." CP at 57. Morgan was requested to provide a progress report in 30 days. There is no evidence in the record concerning Morgan's response to the complaints or the requested progress report.
*778 D. Morgan's Letter to PeaceHealth's CEO
On September 5, 1996, Morgan wrote a letter to PeaceHealth's CEO expressing concern about the effect of cost-cutting measures on patient care. CP at 151. Morgan testified in a declaration that he also expressed his concerns inside the hospital prior to writing the letter. CP at 199.
E. The Evidence Concerning the 1996 and 1997 Complaints and Actions Taken by the Hospital
On October 22, 1996, Fortner forwarded to the Hospital's Health and Well Being Committee a copy of a patient's complaint against Morgan that Fortner received from Dr. Joe Davis. CP at 59. The hand-written, signed complaint was dated September 30, 1996, and stated:
Before Dr. Powers left he sent me to Dr. Morgan (foot spec.) to get a toe nail removed. (I'm still having problems with it [sic] its [sic] been over a year [sic] ) I will never go back to Dr. Morgan as when he was exam. my toe he put his hand on my leg above my knee, I did not like it, it made me feel very uncomfortable and he talked about how he used to use drugs ect. [sic] when he was younger. [sic] Also I went back because I had [a] growth on my toe where the nail was removed, it looked like scabs, anyway he got a piece of gauze and put it on the toe then just squeezed it and ripped off the scabs, it hurt so very bad. [sic] I cried, even his nurse said there was no sense in him hurting me that way. I never complained before because I thought no one cared because I did tell Dr. Powers and he did not seem to think anything of it, but I saw Dr. Noel this Sat [sic] 9-28-96 [sic] because I'm still having problems with my toe, I told him about it and he felt I should report Dr. Morgan as he said Kaiser does not tolerate that kind of behavior. [sic] I felt better after talking to Dr. Noel.
CP at 60-61. There is no evidence in the record regarding any response from the Health and Well Being Committee.
On January 22, 1997, Barbara Sherry, Medical Librarian, wrote a memorandum to Dr. Gary Penner, President of the Medical Staff, reporting that she had repeatedly witnessed Morgan "go through other physician's mailboxes," including those of orthopedic physicians and the other practicing podiatrist. CP at 148. She stated that she witnessed Morgan remove an x-ray from the mailbox of a competitor and review it. CP at 148.
On February 4, 1997, Penner requested the Credentials Committee to investigate a complaint:
I hereby request investigational action regarding a complaint which has been filed against Bruce Morgan, DPM [sic] for inappropriate behavior. This complaint comes in the context of a history of behavior related concerns which are documented in the Medical Staff Office.
CP at 63.
On February 20, 1997, the Credentials Sub Committee met to discuss Penner's request. CP at 65. The meeting minutes indicate that the sub-committee interviewed the medical librarian regarding her complaint. CP at 65. The sub-committee decided to interview Morgan and to interview Fortner regarding the patient complaint. CP at 65.
The Credentials Sub-Committee met again on February 27, 1997. CP at 67. The meeting minutes indicate that the sub-committee first interviewed Fortner regarding the patient complaint. CP at 67. The minutes reveal only that Fortner "summarized" this issue and "another incident of inappropriate behavior" involving Morgan. CP at 67. The sub-committee then interviewed Morgan. CP at 67. Regarding the mailbox complaint, Morgan explained that he frequently got mail belonging to other practitioners and his mail was placed in others boxes, especially that of the other podiatrist. CP at 67. He recognized that he had not handled the misplaced mail problem correctly. CP at 67. He further explained that he thought the x-ray report was for him. CP at 67. Regarding the patient complaint, Morgan explained that the patient had misconstrued his adjusting the armrest and helping the patient out of the examination chair. CP at 67. He offered a tour of his office to see the examination *779 chairs. CP at 67. He stated that he had his assistant with him during that examination and on most occasions. CP at 67. He told the sub-committee that he does not abuse drugs and offered to be tested at any time. CP at 67.
The sub-committee recommended to the full Credentials Committee that Morgan's privileges remain as granted with the provision that if any further concerns or questions regarding inappropriate behavior were reported, the committee would recommend that privileges be immediately suspended and investigation action initiated. CP at 68.
On March 5, 1997, Morgan was informed that the Credentials Committee would be reviewing the sub-committee's report on March 14 and that he was entitled to an informal interview with the committee prior to its recommendation to the Executive Committee. CP at 70. This notice also informed Morgan that the sub-committee's report was available for his review.
Despite the sub-committee's recommendation, the full Credentials Committee apparently decided that further investigation was warranted. CP at 72. It notified Morgan on March 24, 1997, that it would recommend to the Executive Committee that Morgan obtain evaluation and counseling at an out-of-state facility. The Credentials Committee made the following recommendations regarding Morgan to the Executive Committee:
1. You obtain an evaluation through the Professional Assessment Program at Abbott Northwestern Hospital in Minneapolis, Mn. [sic] or a substantially similar program identified by you and approved by the Committee, within a three month period of the adoption of these recommendations by the Governing Board. The full cost of the program will be incurred by you. The program will forward a full evaluation report to the Credentials Committee upon your completion.
2. Whenever you are seeing a female patient in the Hospital you are required to obtain & document the presence of another individual during that patient visit. The responsibility of obtaining, documenting, and securing the observer is yours. Documentation of these visits to be turned into the Credentials Committee within seventy-two hours of each visit. The monitoring will be required for a period of one year from the date of approval of these recommendations by the Governing Board.
3. Your [sic] are required to revert mail that is in your box but does not belong to you to the Medical Staff Coordinator for redistribution. You should not be removing or inputting mail into any other practitioner's box for any reason.
4. If there are any reported incidents of any inappropriate behavior whatsoever, your privileges will be immediately summarily suspended pending investigation.
CP at 72.
The parties point us to no evidence in the record that documents the Credentials Committee's meeting or discussions nor any evidence offered to explain the Credentials Committee's reasons for its recommendation.
Morgan requested and was granted the informal interview with the Executive Board to which he was entitled under the bylaws. CP at 74. The meeting minutes indicate that Morgan provided an explanation of the complaints similar to that which he had provided to the Credentials Sub Committee. CP at 74. He added that his significant hearing loss causes him to lean into people, which he thought might be misconstrued. He indicated that he was willing to obtain an assessment locally but not the evaluation at Abbott Northwestern, which he considered too expensive and beyond his means. He requested a time extension to find another program.
On May 27, 1997, the Governing Board approved the Executive Committee's first recommendation that Morgan obtain evaluation and counseling at Abbot Northwestern, adding that Morgan must consent to the hospital's release to the assessment program of information regarding identified issues and that he must comply with the recommendations and actions identified as a result of the completed assessment. The Governing Board also approved the third recommendation concerning the mailboxes. Finally, the Governing Board added that Morgan's privileges would be subject to summary suspension pending investigation for failure to comply *780 with the two requirements or if any incidents of objectionable behavior were reported.
On August 18, 1997, the Governing Board extended Morgan's time to complete an assessment to September 30, 1997, and warned that if he did not comply, his privileges would be automatically suspended. CP at 80.
On September 30, 1997, Morgan was informed that his clinical privileges were summarily suspended for failure to obtain an evaluation. CP at 82. A copy of the hospital's bylaws was provided to Morgan.
On October 6, 1997, Morgan was provided official notice of an investigational action and a copy of the pertinent bylaws sections. CP at 82. He was informed that he would have an opportunity to meet with the investigational committee that would be appointed by the Credentials Committee.
On October 10, 1997, Morgan met with the Credentials Sub Committee. CP at 86. They discussed Morgan's failure to comply with the Governing Board's requirements. The sub-committee recommended to the Credentials Committee that Morgan's privileges be revoked.
Morgan was invited to the Credentials Committee meeting at which his investigational action was discussed. CP at 90. He did not attend. CP at 90. The Credentials Committee recommended to the Executive Committee that Morgan's clinical privileges be revoked.
The Executive Committee adopted the recommendation that Morgan's privileges be revoked. CP at 92. On October 27, 1997, Morgan was given written notice of this adverse action and informed of his right to request a review hearing within 30 days. CP at 92. A follow-up letter dated October 29, 1997, again informed Morgan of his right to request a hearing and that the failure to do so within 30 days would waive this right. CP at 94. He was informed, along with other details, that he had the right to representation by counsel at the hearing and the right to examine and cross-examine witnesses and present evidence.
Morgan failed to request a hearing. CP at 96. Apparently, either the Executive Committee's action then became final or the Governing Board revoked Morgan's privileges.
F. Litigation
Morgan filed suit on November 27, 1997. The hospital filed a motion for summary judgment on February 20, 1998. Asserting that his discovery requests had gone largely unanswered, Morgan brought a motion to continue the summary judgment and to compel discovery. The trial court denied the motions.
Morgan also brought a motion to strike portions of Coburn's declaration and the attached documents. Morgan argued that the 1981 and 1983 events occurred before Coburn's tenure and thus she has no personal knowledge on which to base her testimony. He objected to the testimony regarding the events in 1994 and 1996 on the grounds that it contains hearsay and double hearsay. The trial court denied the motion.
Finding that PeaceHealth was immune from liability for damages under the HCQIA, the trial court granted partial summary judgment to PeaceHealth on July 1, 1998. On September 10, 1998, the trial court granted summary judgment to PeaceHealth on Morgan's claims for injunctive relief and dismissed all claims.

ANALYSIS

I. Immunity Under the HCQIA
A. The HCQIA
One purpose behind the Health Care Quality Improvement Act is "`to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior.'" See Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996) (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6287, 6384)). Congress sought to encourage self-regulation by physicians by "granting limited immunity from suits for money damages to participants in professional peer review actions." See Mathews, 87 F.3d at 632 (citing 42 U.S.C. §§ 11101(5), 11111(a)). The statutory immunity provides *781 for limitation of damages for "professional review actions":
If a professional review action (as defined in section 11151(9) of this title) of a professional review body[1] meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section
(A) the professional review body,
(B) any person acting as a member or staff to the body,
(C) any person under a contract or other formal agreement with the body, and
(D) any person who participates with or assists the body with respect to the action,
shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.
42 U.S.C. § 11111(a)(1).[2] We discuss the statutory standards that must be met after addressing the preliminary issue of the character of the hospital's actions.
B. A "Professional Review Action" Under the HCQIA
The parties' arguments concerning whether the hospital enjoys immunity under the HCQIA requires us to first determine the nature of the actions taken by the hospital. "Professional review actions" are entitled to immunity only if they meet certain standards, including adequate notice and fair procedures. See 42 U.S.C. § 11112(a). The trial court characterized all the actions by the hospital prior to the suspension of Morgan's privileges as "professional review activities", as distinguished from "professional review actions." CP at 295-96. That is, the trial court found that the Governing Board's approval of the Executive Committee's recommendation that Morgan undergo counseling and evaluation in the selected or approved program with notice that failure to do so would result in summary suspension of his privileges pending investigation was not a professional review action that is subject to the standards and procedures required for immunity. Morgan argues that this finding by the trial court is in error because the recommendation could have eventually affected his privileges. A proper analysis of the immunity question requires us to determine what actions by the hospital are subject to the HCQIA standards.
The HCQIA defines "professional review action":
The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.
42 U.S.C. § 11151(9).
"Professional review activity" is separately defined:

*782 The term "professional review activity" means an activity of a health care entity with respect to an individual physician
(A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
(B) to determine the scope or conditions of such privileges or membership, or
(C) to change or modify such privileges or membership.
42 U.S.C. § 11151(10).
Courts interpreting these definitions have concluded that a professional review action includes "decisions or recommendations that directly curtail a physician's clinical privileges or impose some lesser sanction that may eventually affect a physician's privileges" but not a "decision or recommendation to monitor the standard of care provided by a physician or factfinding to ascertain whether a physician has provided adequate care." Mathews, 87 F.3d at 634. These latter are professional review activities. See id. In Mathews, a letter informed the physician that a review committee recommended that 27 of the physician's case files should be sent to an independent agency for further review and that if the agency agreed with the committee's conclusion that the cases were not managed in an acceptable fashion, a restriction of his privileges would be indicated. See id. at 629. The court found that this action was a professional review activity, not a professional review action, because it did not curtail privileges. See id. at 634; see also Austin v. McNamara, 979 F.2d 728, 735-36 (9th Cir.1992). But see Fobbs v. Holy Cross Health Sys. Corp., 789 F.Supp. 1054, 1065 (E.D.Cal.1992) (characterizing monitoring restraints, including requiring the physician to obtain a second opinion on all admissions and have a monitor present during all surgical procedures, as a review action), rev'd in part on other grounds, 29 F.3d 1439 (9th Cir. 1994).
Here, we agree with the trial court's conclusion that only the suspension of privileges constitutes a professional review action. The activity prior to this action constitutes professional review activity. The recommendation that Morgan obtain evaluation and counseling at either the facility selected by the hospital or one approved by the committee did not curtail his privileges and is similar to the action taken in Mathews. The evaluation and counseling was part of an assessment and fact-finding process. Immunity here does not depend on whether the actions surrounding the recommendation that Morgan obtain evaluation and counseling complied with the HCQIA requirements. PeaceHealth in entitled to immunity if the suspension and revocation actions meet the HCQIA standards.
C. The HCQIA Standards for Immunity
A professional review body is entitled to immunity if its professional review actions meet four standards:
For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken
(1) in the reasonable belief that the action was in the furtherance of quality health care,
(2) after a reasonable effort to obtain the facts of the matter,
(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.
42 U.S.C. § 11112(a).
Under the statutory presumption, Morgan has the burden of establishing by a preponderance of the evidence that the hospital did not meet the standards for immunity. See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 388 (3d Cir.1999); Wayne v. Genesis Med. Ctr., 140 F.3d 1145, 1148 (8th Cir.1998). This burden adds an *783 "unconventional twist" to the summary judgment standard of review. Sugarbaker v. SSM Health Care, 190 F.3d 905, 912 (8th Cir.1999), cert. denied, 528 U.S. 1137, 120 S.Ct. 980, 145 L.Ed.2d 931 (2000). Viewing the evidence in the light most favorable to Morgan, we must determine whether he satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the hospital's review action failed to meet the HCQIA standards. See id.; Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 839 (3d Cir.1999); Bryan v. James E. Holmes Regional Med. Ctr., 33 F.3d 1318, 1334 (11th Cir.1994).
Morgan argues that this presumption applies only to the first standard, which requires that the hospital act with the reasonable belief that the action was in the furtherance of quality health care, and not to the remaining three standards. Morgan points us to the Fobbs court, which stated that "it is clear that the presumption provided in § 11112(a) refers only to the reasonable belief standard of § 11112(a)(1), not to the reasonable belief standard of § 11112(a)(4)." 789 F.Supp. at 1069. The Fobbs court relied on legislative history regarding the statutory presumption:
[r]eflecting the Committee's belief that [the objective `reasonable belief'] standard will be met in the overwhelming majority of professional review actions, the subsection provides a presumption to that effect, requiring a plaintiff to show, by clear and convincing evidence, that no such reasonable belief existed at the time of the professional review action. This presumption applies only to the reasonable belief standard, not to the other standards. Those additional standards require a group engaged in peer review to make a reasonable effort to obtain the facts, to provide adequate due process, and to have a reasonable belief that the professional review action was warranted by the facts known.
789 F.Supp. at 1069 (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, reprinted in 1986 U.S.C.C.A.N. 6384, 6393).
Legislative history notwithstanding, the plain words of the statute make the presumption applicable to all four of the standards: "[a] professional review action shall be presumed to have met the preceding standards". 42 U.S.C. § 11112(a). "Standards" is plural. Moreover, circuit courts consistently apply the presumption to the other standards, including the Ninth Circuit, in which the Fobbs court is located. See, e.g., Smith v. Ricks, 31 F.3d 1478, 1485-87 (9th Cir.1994); Sugarbaker, 190 F.3d at 916-17; Bryan, 33 F.3d at 1334-37; Mathews, 87 F.3d at 634-38. We find that the presumption applies to all of the standards in section 11112(a).
Finally, Morgan argues that the HCQIA immunity applies only to review actions addressing medical incompetence involving patient injury and asserts that none of the complaints against him involved patient care or injury at St. John (the complaint regarding patient care arose out of an incident occurring at Morgan's office, not at the hospital). Morgan thus contends that the HCQIA does not apply here where the complaints concern "objectionable behavior". But under the plain language of the statute, it applies to actions taken in response to both the competence and professional conduct of the physician. See 42 U.S.C. § 11151(9). Nothing in the statute or case law indicates that immunity does not lie for actions taken in response to unprofessional conduct unrelated to the technical proficiency of the physician. See e.g., Bryan, 33 F.3d at 1326 (finding immunity where the action was taken in response to more than 50 written incident reports involving unprofessional or disruptive behavior including complaints regarding the physician's abusive treatment of nurses, technicians, and fellow physicians). Undoubtedly, unprofessional conduct may adversely affect the quality of health care. Even unprofessional conduct toward other staff members may detrimentally affect patient care. See id. We conclude that the HCQIA is not limited to review actions taken in response to patient injury and find that the HCQIA applies here.
We can now turn to an evaluation of whether the hospital met the four requirements for immunity.
*784 1. Reasonable Belief that the Action Was in the Furtherance of Quality Health Care
Morgan argues that he has rebutted the presumption that the hospital's peer review investigation and action was taken with the reasonable belief that it was in furtherance of the quality of health care because (1) the action was based upon only four complaints spread over seventeen years, two of which arose out of events occurring outside of St. John, and (2) the peer review activities and action took place against a backdrop of Morgan's complaints regarding Peace Health's cost-cutting measures and the adverse effects on the quality of care at St. John's. Thus, he argues that a reasonable jury could find that the peer review action was in retaliation and not in the furtherance of quality health care.
The reasonable belief required by the first prong is measured by an objective standard. See Pamintuan, 192 F.3d at 389; Bryan, 33 F.3d at 1335. Any bad faith on the part of the hospital is irrelevant. See Pamintuan, 192 F.3d at 389; Bryan, 33 F.3d at 1335. "This prong of the HCQIA immunity test is met if `the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.'" Bryan, 33 F.3d at 1334-35 (quoting H.R.Rep. No. 903, at 10, reprinted in 1986 U.S.C.C.A.N. at 6393).
Morgan points us to Boczar v. Manatee Hosps. and Health Sys., Inc., 993 F.2d 1514 (11th Cir.1993), where the court reversed a judgment notwithstanding the verdict that the trial court entered after the jury awarded the physician damages on her antitrust conspiracy action. The court found sufficient evidence for a jury to infer that peer review proceedings against the physician were a sham and part of an unlawful conspiracy on the part of the hospital and staff. See id. at 1519. But Boczar never discusses application of the HCQIA, and the physician presented testimony at trial tending to show that one of the complaints against her was manufactured or exaggerated. See id. at 1518-19.
We find, under an objective measure, that Morgan has not rebutted the presumption that the hospital's peer review action meets the first standard. His evidence of his expressed concerns over cost cutting by PeaceHealth is insufficient. There is no evidence that Morgan reported his concerns to the press or a regulatory agency. The letter was not threatening and voiced concerns in a reasonable manner. Morgan presents no evidence that links the expression of his concerns with the actions by the hospital.
2. Reasonable Effort to Obtain the Facts of the Matter
The relevant inquiry under the second requirement is whether the totality of the process leading up to the professional review action evidenced a reasonable effort to obtain the facts of the matter. See Mathews, 87 F.3d at 637.
While Morgan does not bring forth specific evidence to rebut the fact-finding process, he argues the lack of evidence. There is only one complaint directly involving patient care. This complaint involved follow-up treatment of a toenail. There is no evidence that the hospital interviewed the patient or reviewed the patient's medical file. There is no evidence that the hospital attempted to interview the other doctors that the patient contacted concerning the incident. There is no evidence in the record that the hospital concluded that the treatment actually fell below the accepted standard of care.
The same complaint alleged inappropriate touching by Morgan. Again, there is no evidence that the hospital attempted to interview the patient or the doctor to whom she personally related the incident to determine the seriousness of the conduct.
There is no evidence in the record that the hospital conducted any further investigation of 1994 complaints regarding sexually suggestive comments, inappropriate touching, and unwanted advances. There is no evidence in the record that suggests that the hospital conducted follow-up interviews with the complaining employees to determine whether any further inappropriate behavior had occurred.
*785 Regarding the mail box complaint, the hospital interviewed only one of its own employees. There is no evidence in the record before us as to the number of incidents of viewing others' mail nor the duration of this behavior. Except for the one x-ray, there is no evidence in the record that the hospital found that the mail that was inappropriately viewed by Morgan was patient-related or that he otherwise breached patient confidentiality.
But Morgan's privileges were not suspended and then revoked because of any one complaint nor even because of the accumulation of complaints. His privileges were suspended because he failed to obtain evaluation and counseling. In effect, the hospital, by requiring evaluation, was attempting to make further investigation into Morgan's conduct. The evidence of inappropriate behavior was sufficient to warrant further investigation. Morgan may not now complain that the hospital failed to obtain the facts of the matter where Morgan declined to cooperate in the investigation by failing to undergo evaluation. We find that Morgan has not rebutted the presumption that the hospital failed to make reasonable effort to obtain the facts of the matter.[3]
3. Adequate Notice and Hearing Procedures
The HCQIA provides a safe harbor clause regarding the adequate notice and fair procedures requirements:
A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
(1) Notice of proposed action
The physician has been given notice stating
(A)(i) that a professional review action has been proposed to be taken against the physician,
(ii) reasons for the proposed action,
(B)(i) that the physician has the right to request a hearing on the proposed action,
(ii) any time limit (of not less than 30 days) within which to request such a hearing, and
(C) a summary of the rights in the hearing under paragraph (3).
(2) Notice of hearing
If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating
(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
42 U.S.C. § 11112(b).
We find that the Hospital met these provisions in regard to the review action of suspension of privileges. Morgan was informed of every recommendation of each committee reviewing his conduct. He was notified that the Executive Committee recommended to the Governing Board that he obtain evaluation and counseling. He was notified that the Governing Board approved this recommendation and that noncompliance would result in suspension. His time for compliance was extended and he was again warned that noncompliance would result in suspension. Thus he was notified of the proposed suspension and the reasons for it. When the Credentials Committee made its recommendation to the Executive Committee that Morgan obtain evaluation, he was provided a copy of the bylaws, which describe *786 the investigational action process. When his privileges were suspended, he was again provided with a copy of the bylaws. Morgan met with the Credentials Sub Committee after the suspension. When his privileges were revoked, he was advised of his right to request a hearing within 30 days. His failure to do so waived his right to a hearing at this point.[4]
Morgan argues that the Credentials Committee ignored the recommendation of its sub-committee that his privileges should remain the same. But the fact that varying review committees differed on its conclusions does not undermine the fairness of the procedures. See Sugarbaker, 190 F.3d at 915.
In his recitation of the facts, Morgan also implies some appearance of unfairness in that Fortner, who forwarded the patient complaint to the Health and Well Being Committee, was married to the chair of the Credentials Committee, and that Fortner was on multiple committees. But Morgan waived any such complaint by failing to make contemporaneous objection to the procedures employed. See Sugarbaker, 190 F.3d at 915.
We find that Morgan has not rebutted the presumption that the notice and procedures were fair.
4. Reasonable Belief that the Action Was Warranted by the Facts Known After Such Reasonable Effort to Obtain Facts and After Adequate Notice and Procedures
The analysis under section 11112(a)(4), requiring a reasonable belief that the action was warranted given the facts known at the time, closely tracks the analysis under section 11112(a)(1), requiring a reasonable belief that the action furthered quality health care. See Sugarbaker, 190 F.3d at 916.
Again, the hospital did not suspend and then revoke Morgan's privileges because of the complaints but rather because he failed to comply with the hospital's requirement that he obtain evaluation and counseling. It is not unreasonable to conclude that a physician's failure to comply with investigation and failure to undergo evaluation and counseling might impact patient care. Morgan's inappropriate behavior was sufficient to warrant additional evaluation. We find that Morgan has not rebutted the reasonable belief that his failure to comply with the evaluation requirement warranted suspension.
D. Conclusion of HCQIA Immunity Analysis
Because Morgan failed to rebut the presumption that the hospital satisfied the HCQIA immunity requirements, we find that PeaceHealth is entitled to immunity from liability for damages.[5]
II. Discovery
Morgan assigns error to the trial court's denial of his motion to compel discovery. He also argues that the trial court erred in refusing to grant his motion to continue the summary judgment because his discovery was incomplete. He asserts that he sought discovery on whether the hospital's actions were reasonable, indicated bias, were procedurally different than like action taken against others, or were retaliatory in nature.
CR 56(f) provides:
Should it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment *787 or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
"A ruling on a CR 56(f) motion for a continuance is reviewed for manifest abuse of discretion. Discretion is not abused if: (1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence; (2) the requesting party does not state what evidence would be established through the additional discovery; or (3) the desired evidence will not raise a genuine issue of material fact." Janda v. Brier Realty, 97 Wash.App. 45, 54, 984 P.2d 412 (1999) (internal quotations and citations omitted).
The unanswered discovery that Morgan sought in his first and second requests for production and interrogatories was not likely to raise a genuine issue of material fact because it pertained primarily to information concerning other health care providers. This information was irrelevant because the inquiry under the HCQIA immunity issue is whether the hospital met the standards in its review of Morgan and not how that review compares with other investigations or discipline. Nor is the competency of other doctors relevant to whether the hospital conducted a reasonable review of Morgan. See Pamintuan, 192 F.3d at 389. We find that the trial court did not abuse its discretion by denying the motion to compel and the motion to continue because the discovery sought was irrelevant.
III. Evidentiary Rulings
Morgan argues that the trial court erred in refusing to strike the declaration of Coburn, who had been the Hospital's risk manager since 1989. He contends that Coburn had no personal knowledge of the events occurring in 1981 to which she testified. He also argues that her testimony regarding later events contains hearsay and double hearsay. Apparently, the only supporting document which Morgan claims should be stricken is the Monticello document related to the 1981 complaint.
"A trial court has broad discretion in ruling on evidentiary matters and will not be overturned absent manifest abuse of discretion." Sintra, Inc. v. City of Seattle, 131 Wash.2d 640, 662-63, 935 P.2d 555 (1997).
But regardless of whether the trial court erred in considering the evidence to which Morgan objects, any error is harmless. This court performs a de novo review of a summary judgment. As Morgan states, the supporting documents speak for themselves. Coburn's declaration is little more than a detailed index of the supporting documents. Our conclusions are not based on information found in Coburn's declaration but on the underlying documents themselves. Moreover, we come to the same conclusion that the hospital is entitled to immunity if we ignore the Monticello document related to the 1981 complaint because the suspension review action was taken not due to the complaints alone but due to Morgan's failure to obtain evaluation and counseling.
IV. Injunctive Relief
Under the Washington Health Care Peer Act, RCW 7.71.030, Morgan is entitled to injunctive relief only for actions not related to Morgan's professional conduct. We find that the review action was related to Morgan's professional conduct; he has no action for injunctive relief.
V. Attorney Fees
PeaceHealth requests attorney fees under RAP 18.1 and the HCQIA, which provides:
In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith. For the purposes of this section, a defendant shall not be considered to have substantially prevailed when the plaintiff obtains an award for *788 damages or permanent injunctive or declaratory relief.
42 U.S.C. § 11113.
We deny attorney fees and costs on appeal to PeaceHealth under RAP 18.1 and 42 U.S.C. § 11113 because we do not find that Morgan's claim is frivolous, unreasonable, without foundation, or in bad faith.

CONCLUSION
Finding that PeaceHealth is entitled to immunity under the HCQIA, we affirm.
BECKER, A.C.J., and COX, J., concur.
NOTES
[1] 42 U.S.C. § 11151(11) provides: "The term `professional review body' means a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity."
[2] Our legislature adopted the federal HCQIA as law in Washington. See RCW 7.71.020. Washington law further provides express and exclusive remedy for professional review actions based on matters other than competence or professional conduct:

(1) This section shall provide the exclusive remedy for any action taken by a professional peer review body of health care providers as defined in RCW 7.70.020, that is found to be based on matters not related to the competence or professional conduct of a health care provider.
(2) Actions shall be limited to appropriate injunctive relief, and damages shall be allowed only for lost earnings directly attributable to the action taken by the professional review body, incurred between the date of such action and the date the action is functionally reversed by the professional peer review body.
RCW 7.71.030.
[3] We note that although Morgan objected to the expense of the evaluation and counseling program that the hospital selected, he has not argued to this court that the hospital's choice was a pretext, that is, that the hospital purposefully chose an unreasonably expensive program in order to set up Morgan's failure and the consequential revocation of his privileges. Morgan has brought forth no evidence to show that the hospital unreasonably rejected a local or less expensive evaluation program that was sufficient and reasonable under the circumstances. Nor has Morgan specifically argued that his behavior was insufficient to warrant some evaluation and counseling.
[4] Morgan complains that he was not afforded a hearing, but this argument depends on his characterization of the recommendation that he obtain evaluation and counseling as a review action. Because we found above that the hospital's activities prior to the suspension were not review actions, the hearing which Morgan claims he was not afforded was not required. Furthermore, the specific provisions of section 11112(b) are only a safe harbor and are not necessarily required. The standard requires only that the notice and procedures be fair under the circumstances. The procedures used throughout the review process here, although informal, were fair under the circumstances.
[5] Because we find that PeaceHealth is entitled to immunity, we need not address Morgan's claims for violation of the CPA, interference with business expectancy, or violation of the Washington Constitution.