[No. 63845-9-I. Division One. December 28, 2009.]

Pamela D. Cowell, *Appellant*, v. Good Samaritan Community Health Care et al., *Respondents*.

912

*Wendy Lilliedoll* and *Judith A Lonnquist* (of *Law Offices of Judith A. Lonnquist PS*), for appellant.

*Greg Montgomery* (of *Miller Nash LLP*) and *Howard M. Goodfriend* (of *Edwards Sieh Smith & Goodfriend PS*), for respondents.

¶1 LEACH, J. — Dr. Pamela Cowell appeals the summary judgment dismissal of her claims for damages against Good

Samaritan Health Care (GSH)[1] and various practitioners who participated in the peer review process leading to the suspension and termination of her privileges. She claims to have raised a question of fact about respondents' entitlement to immunity under the Health Care Quality Improvement Act of 1986 (HCQIA or Act), 42 U.S.C. §§ 11101-11152. Cowell also contends that the trial court erred in striking transcripts of her interviews with the Investigation Committee and in awarding attorney fees and costs to respondents. Because Cowell did not present evidence creating a material issue of fact regarding respondents' immunity under the HCQIA, the trial court properly dismissed Cowell's claim on summary judgment. Any error the court may have committed in striking the transcripts is harmless, and no error occurred in awarding fees and costs to respondents. We affirm.

## Background

¶2 In September 1998, GSH appointed Cowell to the medical staff as an obstetrician and gynecologist. Under the medical staff bylaws, Cowell served as a provisional staff member and was required to apply for renewal of her clinical privileges every two years following her initial appointment. About one year later, Cowell entered into a separation agreement with GSH. She opened her own private practice in Lakewood but retained her GSH staff membership and privileges.

¶3 In May 2000, concerns about Cowell's ability to perform laparoscopic procedures prompted Dr. Jacob Kornberg, chair of the Surgery Committee, to ask Cowell to videotape all of her laparoscopic cases. When Cowell applied for renewal of her privileges in August 2000, Kornberg asked her to revise her application to request privileges only for basic laparoscopic procedures due to her low case

---

[1] Good Samaritan Health Care owns Good Samaritan Hospital. The hospital and physicians jointly own Good Samaritan Surgery Center. We refer to these entities collectively as "GSH."

load involving more advanced laparoscopic procedures.[2] Cowell reluctantly agreed, and the Board of Trustees (Board) approved her reappointment with privileges to perform only certain laparoscopic procedures.

¶4 In 2001, Cowell opened a practice in Puyallup. She admits that on April 12, 2002, as the attending physician, she performed a laparoscopic assisted vaginal hysterectomy (LAVH)—a procedure for which she did not have privileges.

¶5 In May 2002, the GSH Obstetrics Quality Assurance Committee reviewed one of Cowell's cases, the "terbutaline" case, and designated it as "an opportunity for improvement in clinical care/management."[3] That same month, Cowell responded to complaints about her performance in the operating room by offering to videotape her more complex surgical procedures.

¶6 In August 2002, Cowell was informed that the GSH Medical Executive Committee (MEC) recommended a focused review of her practice from September through December 2002. While this review revealed no adverse outcomes, the Obstetrics and Gynecology (OB/GYN) staff commented that Cowell behaved erratically in stressful situations. The MEC recommended that Cowell receive counseling for stress management. Cowell rejected the recommendation.

¶7 In January 2003, Cowell again applied for reappointment, which was approved by the Board. Cowell admits that she later performed three LAVHs, which were still beyond the scope of her privileges, as the attending physician on November 19, 2003, February 6, 2004, and June 11, 2004.

¶8 In September 2004, the OB/GYN Quality Assurance Committee reviewed four of Cowell's cases and designated

---

[2] Kornberg warned that failure to make this revision could result in a denial of privileges by GSH that would be reportable to the National Practitioner Data Bank. Kornberg advised Cowell that she could regain these privileges by reapplying for them in the future and then having a preceptor assigned.

[3] A nurse alleged that Cowell failed to check the dosage of terbutaline given to a patient and argued with nurses about a prolapsed umbilical cord.

three of them, the "penicillin" case, the "OCT" case, and the "sequestration" case, as opportunities for improvement in clinical care or documentation.[4] In December 2004, the nursing staff voted Cowell as "Doctor of the Month."

¶9 In March 2005, the Board approved Cowell's reappointment, with privileges to perform LAVHs,[5] for six months. One month later, Cowell was notified that five cases, the penicillin, OCT, and sequestration cases, as well as the "ectopic" case and the "impacted head" case,[6] were being sent outside GSH for review.[7] Cowell met with the Peer Review Committee (PRC) to discuss the results of this outside review in August 2005. The PRC recommended to the MEC that all of Cowell's laparoscopic surgeries, except tubal ligations and diagnostic procedures, be monitored by a preceptor and videotaped.[8] These requirements would remain in effect until the PRC reviewed the successful completion of 10 procedures and notified the MEC. Cowell agreed to these requirements, provided they were not reportable to the National Practitioner Data Bank (NPDB). In October 2005, the Board renewed her appointment, with privileges to perform LAVHs, for one year.

¶10 In March 2006, Dr. Cecil Snodgrass, the PRC chair, submitted a request for corrective action regarding Cowell's clinical practices to Dr. Brett Lambert, the medical staff president and MEC chair. The request focused on two

---

[4] These three cases involved allegations that Cowell failed to note a patient's allergy to penicillin, misused an oxytocin challenge test, and argued with a nurse about the sequestration of an infant from her mother for drug testing.

[5] The Investigation Committee noted in its timeline of events that "[n]o one caught the fact that [Cowell's] laparoscopic privileges were limited."

[6] The ectopic and impacted head cases involved complaints that Cowell was unfamiliar with equipment in performing a laparoscopic excision of an ectopic pregnancy and that she mishandled the delivery of an impacted fetal head.

[7] The external reviewer noted communication issues in all of the cases and questioned Cowell's competence to perform laparoscopic surgery in one case.

[8] The PRC concluded that there was an opportunity for improvement in clinical care in the penicillin, OCT, sequestration, and impacted head cases. In the ectopic case, PRC stated that clinical care was "not appropriate." Dr. Carrie Wong, an OB/GYN physician, was a member of the PRC.

surgical cases: the "abscess" case and the "placenta" case.[9] The MEC met on March 6, 2006, and, the same day, Lambert notified Cowell that the MEC was appointing an Investigation Committee (IC). Cowell was told that the investigation would not be limited to the abscess and placenta cases and was later informed that the IC's members were Drs. Kevin Taggart, Maureen Smith, and Robert Wright.

¶11 In April 2006, Cowell performed a tubal ligation that involved severe bleeding, the "JW" case.[10] Lambert summarily suspended Cowell's privileges on April 28, 2006, after speaking with physicians involved in the JW case, reviewing the patient's records, and meeting with Cowell. Cowell was informed that the MEC would review her suspension at its May 1, 2006, meeting, which she was invited to attend. At this meeting, Cowell described her version of events in the JW case. The MEC upheld the suspension and notified Cowell of its decision two days later. Cowell requested and received a hearing on the summary suspension.

¶12 About the same time, the IC invited Cowell to discuss the abscess and placenta cases. The IC informed Cowell in its letter of invitation that other cases, including the JW case, might be discussed. The IC also provided Cowell with a list of questions relating to issues that included "the scope of your clinical practice in terms of [your] clinical privileges" and "archiving videotaped cases." The IC also asked for nine videotapes of Cowell's laparoscopic procedures. At Cowell's request, the interview was postponed until June 2006, at which time the IC met with Cowell for nearly three hours. A 90-minute follow-up interview occurred in July 2006. Cowell secretly recorded both interviews and had the recordings transcribed.

---

[9] These cases involved the drainage of a pelvic abscess and an elective caesarian section operation on a patient with an anterior placenta.

[10] The patient, a Jehovah's Witness, would not accept blood transfusions. One of the nurses involved in the JW case was Michelle Waterland. Waterland later testified at the hearing on Cowell's suspension.

¶13 The hearing on the summary suspension took place before a Hearing Committee (HC) over four evenings in July 2006. In affirming the suspension, the HC found that Cowell had met her burden of showing that there was no substantial factual basis to support GSH's charges of inadequate care in the abscess and placenta cases. But it found that Cowell had failed to satisfy her burden in the JW case. Cowell requested and received appellate review of the summary suspension.

¶14 On July 28, 2006, the IC issued its report. It included findings that Cowell (1) did not "engage cooperatively in the peer review process and ensure appropriate oversight," as demonstrated in the abscess, placenta, and JW cases,[11] (2) failed to comply with her commitments to have her procedures videotaped and monitored, and (3) appeared to have practiced outside the scope of her privileges by performing LAVHs from 2002 to 2005. The IC recommended that the MEC continue the suspension and terminate Cowell's privileges. Cowell received the IC's report on August 2, 2006, and the first HC's report on August 4, 2006.

¶15 On August 7, 2006, the MEC met to consider the IC's report. Cowell was allowed 30 minutes to provide a response to the report. Cowell accepted the invitation and read a prepared statement. The MEC voted unanimously to adopt the IC's recommendations.[12] Cowell received notice of the MEC's decision three days later. After being informed of her right to a hearing, she requested one.

¶16 Cowell's appeal of the first HC's decision on the summary suspension took place on October 26, 2006. On November 14, 2006, the Board's Appellate Review Committee (ARC) concluded that Cowell had not met the standard of care in the JW case and affirmed the suspension. The

---

[11] The IC concluded that Cowell "likely failed to meet the standard of care" in the JW case.

[12] Dr. Elizabeth Lien, an internist specializing in infectious diseases, was a member of the MEC.

Board adopted the ARC's recommendation, and GSH notified Cowell of the Board's decision.

¶17 The hearing on the termination was held over the course of seven days in November and December 2006 before a second HC. Nine cases were considered—the terbutaline, penicillin, OCT, sequestration, ectopic, impacted head, abscess, placenta, and JW cases—as well as issues relating to Cowell's cooperation with the peer review process and her performance of procedures outside the scope of her privileges. On December 29, 2006, this second HC issued its report. The HC found no substantial factual basis for the IC's conclusions that Cowell's clinical practices violated the standard of care. But it found a substantial factual basis for the IC's conclusions that Cowell (1) had a "combative history with the peer review process," (2) did not fully carry out her videotaping and monitoring commitments, and (3) exceeded the scope of her privileges. The HC recommended that Cowell's surgical privileges be terminated but her nonsurgical privileges be reinstated.

¶18 A second ARC heard Cowell's appeal of the second HC's decision on March 19, 2007. On April 12, 2007, this ARC affirmed the HC's conclusions that Cowell had performed procedures beyond the scope of her privileges and had failed to participate collaboratively in the peer review process. On April 17, 2007, the Board approved the ARC's recommendation. As required by 42 U.S.C. § 11133(a), the privilege suspension and termination were reported to the NPDB.

¶19 Cowell filed suit for damages against GSH and various individuals who had participated in the peer review process, alleging defamation, tortious interference with her practice, breach of contract, and violations of the Washington Consumer Protection Act, RCW 19.86.020. Cowell also sought to enjoin the revocation of her privileges. Respondents moved for summary judgment and to strike the transcripts of the IC's interviews with Cowell. The court granted both motions. In striking the transcripts, the court ruled that interviews were private conversations under

RCW 9.73.030(1)(b). In granting summary judgment to respondents on the damages and injunctive relief claims, the court held respondents were immune under the HCQIA. The court also awarded respondents attorney fees and costs. Cowell appeals the dismissal of her action for damages and the award of attorney fees and costs.[13]

## Analysis

### A. Immunity Under the HCQIA

■ ■ ¶20 The primary question is whether Cowell presented sufficient evidence to raise a factual issue about respondents' entitlement to immunity under the HCQIA. Congress passed this Act " 'to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior.' "[14] To promote effective self-regulation by physicians, the Act grants limited immunity from damages to participants in professional peer review actions.[15]

¶21 Cowell asserts that respondents are not entitled to HCQIA immunity for three reasons. First, respondents' peer review actions did not satisfy the immunity elements under 42 U.S.C. § 11112(a). Second, various practitioners participating in GSH's peer review process as witnesses and decision makers violated § 11111(a)(2) by making statements they knew were false. Finally, GSH violated § 11137(c) by submitting a false report to the NPDB.

---

[13] Cowell does not appeal the trial court's dismissal of her request for injunctive relief under the Washington health care peer review act, RCW 7.71.030. She discusses this request only as it relates to the award of attorney fees.

[14] *Morgan v. PeaceHealth, Inc.*, 101 Wn. App. 750, 762, 14 P.3d 773 (2000) (internal quotation marks omitted) (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996)). Washington has adopted the HCQIA. *See* RCW 7.71.020.

[15] *Morgan*, 101 Wn. App. at 762 (quoting *Mathews*, 87 F.3d at 632). The HCQIA provides immunity from damages, not from injunctive relief. *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 911 (8th Cir. 1999).

### 1. Immunity Elements under § 11112(a)

■ ■ ¶22 Cowell claims that respondents' peer review actions did not meet the immunity requirements of § 11112(a). This statute contains four elements that a professional review action[16] must meet for its participants to receive immunity:[17]

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). These four elements are measured by "objective reasonable belief standards," which look to the totality of the circumstances.[18] The Act creates a presump-

---

[16] A "professional review action" is defined as

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician.

42 U.S.C. § 11151(9).

[17] If a professional review action meets the four elements under § 11112(a), a professional review body, any person acting as a member or staff to the body, any person under a contract or other formal agreement with the body, and any person who participates or assists the body with respect to the action, shall not be liable for damages with respect to the action. 42 U.S.C. § 11111(a). A "professional review body" is defined as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11).

[18] *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 32 (1st Cir. 2002).

tion that a professional review action meets these four elements unless the plaintiff can rebut the presumption by a preponderance of the evidence.[19]

■ ¶23 This rebuttable presumption "adds an 'unconventional twist' to the summary judgment standard of review."[20] Although respondents are the moving parties, this court must view the evidence in the light most favorable to Cowell and determine whether she has shown that a reasonable jury could conclude, by a preponderance of the evidence, that respondents' review actions did not meet all four elements of § 11112(a).[21] Respondents are thus relieved of the initial burden of providing evidentiary support for their motion. Cowell's burden, however, remains similar to the burden faced by any plaintiff confronted with a properly supported motion for summary judgment: to defeat the motion she must raise a genuine issue of material fact as to whether respondents' peer review actions did not satisfy at least one of the § 11112(a) elements.[22]

¶24 Applying these principles, we analyze the evidence Cowell relies upon to challenge the MEC's August 7, 2006, recommendations to continue her suspension and terminate her privileges and the Board's decisions affirming the suspension and termination of her privileges. Because the actions regarding termination are dispositive, we focus on these review actions.

### a. Reasonable Belief that the Action Was in the Furtherance of Quality Health Care

■ ¶25 Since the reasonable belief required by the first element under § 11112(a) is measured by an objective standard, bad faith on the part of the reviewers is irrel-

---

[19] 42 U.S.C. § 11112(a).

[20] *Morgan*, 101 Wn. App. at 766 (quoting *Sugarbaker*, 190 F.3d at 912).

[21] *Morgan*, 101 Wn. App. at 766-67. This summary judgment standard indicates that "a jury could be asked to decide the ultimate issues of reasonableness," but under the objective standards set forth in the statute, reasonableness determinations under the HCQIA may become legal determinations appropriate for resolution at summary judgment. *Singh*, 308 F.3d at 34, 36.

[22] *Singh*, 308 F.3d at 33.

evant.[23] The relevant inquiry is whether " 'the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.' "[24] To prevail, Cowell must provide evidence sufficient to permit a jury to find that she has overcome, by a preponderance of the evidence, the statutory presumption that reviewers in the position of members of the Board and MEC would have reasonably believed that their actions would restrict incompetent behavior or would protect patients.[25]

¶26 Cowell contends that she met this burden on two grounds. First, she claims that she did not place patients at risk by performing four LAVHs without specific privileges. She relies on evidence showing that she performed the four LAVHs in the presence of Dr. J. Michaelson, who had privileges to perform LAVHs, that the IC and second HC did not find that the LAVHs were significantly more advanced than the laparoscopic procedures for which Cowell did have privileges, that none of the LAVHs had any complications, and that she was granted privileges to perform LAVHs in 2005. Second, Cowell claims that she did not place patients at risk by failing to videotape all of her laparoscopic procedures. She points to evidence demonstrating that videotaping is not an effective method of assessing a physician's surgical skills,[26] that no other gynecologist was asked to videotape his or her procedures, and that the videotapes were never reviewed.

¶27 These arguments are misdirected because they focus on whether Cowell actually harmed patients and whether respondents' actions actually improved health

---

[23] *Morgan,* 101 Wn. App. at 769.

[24] *Morgan,* 101 Wn. App. at 769 (internal quotation marks omitted) (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1334-35 (11th Cir. 1994)).

[25] *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir. 1992) (quoting H.R. Rep. No. 99-903, at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6392-93).

[26] Cowell relies on the report of an external reviewer, Dr. Joseph S. Sanfilippo.

care. But "the HCQIA is not limited to review actions taken in response to patient injury."[27] Furthermore, "the Act does not require that the professional review result in an actual improvement of the quality of health care[, only that] the process was undertaken in the *reasonable belief* that quality health care was being furthered."[28]

¶28 Concerns about Cowell's ability to perform advanced laparoscopic procedures such as LAVHs arose as far back as May 2000. She was asked to videotape her procedures at that time, and restrictions were placed on her privileges in August 2000. Behavioral issues surfaced in 2002 when a focused review of Cowell's practice led to MEC's recommendation that Cowell receive counseling for stress management, which Cowell declined. From 2002 to 2006, internal and external reviews of Cowell's cases raised further questions about her clinical competence and ability to work with others and reinforced placing restrictions on her privileges and oversight measures of her practices.

¶29 The IC's report thoroughly documented this history and expressed these concerns in support of its recommendation to the MEC that Cowell's privileges be terminated. The report concluded that Cowell "has engaged in a pattern of disregarding commitments she has made to have procedures videotaped, has performed procedures outside the scope of her privileges, and has otherwise failed to engage fully and cooperatively in the peer review process." From interviewing Cowell, the IC noted that

> [Cowell] conveyed a lack of recognition of the importance of the peer review process and an unwillingness to participate by neither providing the [video]tapes nor otherwise following through with her agreement to have a preceptor in the operating room. [Cowell] referred to Dr. Michaelson as her preceptor, and states that it would be very difficult for her to find a preceptor on a routine basis. It appears to us that [Cowell] has performed procedures as the attending physician for which she

---

[27] *Morgan*, 101 Wn. App. at 768.

[28] *Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026, 1030 (4th Cir. 1994).

does not have privileges, in violation of Hospital Bylaws, Rules and Regulations.

The IC also reported that on four separate occasions Cowell "appears to have performed [LAVHs] when she did not have privileges to perform this procedure, in violation of the Medical Staff Bylaws." Further, the IC found that Cowell had improperly obtained privileges to perform LAVHs in 2005 without "tak[ing] affirmative steps such as completing additional continuing medical education."

¶30 The second ARC report also extensively discussed Cowell's performance of procedures outside the scope of her privileges and her failure to cooperate with the peer review process. It rejected many of the arguments that Cowell raises on appeal. Notably, the ARC rejected Cowell's contention that she misunderstood the process for obtaining privileges she had voluntarily given up, pointing to Kornberg's letter advising Cowell of the privilege reapplication process and the medical staff bylaws.[29] In affirming the second HC's findings that Cowell had exceeded the scope of her privileges, this ARC stated,

> [T]he evidence in the record establishes that [Cowell] knew the extent of her surgical privileges, knew and acknowledged her personal responsibility for practicing within the privileges granted her by the Hospital, and knew and acknowledged that even the simple surgical procedures for which she had privileges were surgical procedures that placed patients at substantial risk unless expertly performed. Yet, despite this knowledge and these acknowledgments, [Cowell] proceeded on multiple occasions to perform more complicated surgical procedures for which she did not have privileges, placing both patients and the Hospital at risk.

This ARC agreed with the second HC's conclusion that Cowell had a combative history with the peer review process, noting that

---

[29] Article IV, section 5 of the bylaws states, "To renew or reinstate a privilege that has been voluntarily or involuntarily reduced will require completion of the privilege request and approval process for specific privilege(s) to be renewed."

[o]n multiple occasions between 2000 and 2005, [Cowell] was requested to or required to video tape her laparoscopic procedures. She consistently failed to obtain the video tapes, citing, as justification for this failure, the inability of nurses to operate the equipment, the failure of a member of the hospital administrative staff to provide for video taping, or her misunderstanding of what procedures were to be video taped.

A physician who will not work collaboratively with the peer review process . . . impairs the ability of the medical staff and the hospital to improve the quality of medical care provided to patients.

Thus, the record contains abundant evidence of concerns about Cowell's performance of procedures beyond the scope of her privileges and her inability to have her procedures properly videotaped and monitored. In light of this record, Cowell's claim that such concerns were "shifting justifications for disciplinary actions" lacks merit. The fact that these particular concerns later emerged as the primary reasons for terminating her privileges is not evidence that the MEC and the Board did not reasonably believe that they were furthering quality health care in terminating Cowell's privileges.[30]

¶31 In sum, the MEC's recommendation and the Board's decision were based on long-standing concerns that Cowell's conduct—namely her performance of LAVHs without privileges and her failure to comply with videotaping and monitoring requirements—negatively impacted patient care. " 'Quality health care' is not limited to clinical competence, but includes matters of general behavior and ethical conduct."[31] Thus, Cowell has not created an issue of fact as to whether reviewers, in the position of members of the MEC and the Board, would reasonably have concluded, based on the information before them, that their actions

---

[30] See Lee v. Trinity Lutheran Hosp., 408 F.3d 1064, 1071 (8th Cir. 2005) (" 'The fact that some of the specific concerns shifted or changed over time does not rebut the presumption' that the hospital acted in the reasonable belief that it was furthering quality health care." (quoting Sugarbaker, 190 F.3d at 913)).

[31] Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 469 (6th Cir. 2003).

were necessary to protect patients or restrict incompetent behavior.

### b. Reasonable Effort To Obtain the Facts

¶32 The relevant inquiry under the second element of § 11112(a) is whether "the totality of the process leading up to the professional review action evidenced a reasonable effort to obtain the facts of the matter."[32]

¶33 Cowell's challenge to the actions taken by the MEC and the Board under this element focuses on the adequacy of the IC's investigation in three areas. First, Cowell argues that the IC did not reasonably investigate whether she practiced within the scope of her privileges because the IC failed to review the Surgery Quality Assurance Committee meeting minutes for June 17, 2002. These minutes state that Kornberg and Dr. Paul Eun, the OB/GYN chair, failed to inform Cowell that she exceeded the scope of her privileges in performing the LAVH on April 12, 2002. According to Cowell, Eun further indicated in his reappointment review dated March 27, 2003, that Cowell had practiced within her privileges. Cowell also points to the testimony of Dr. Smith, an IC member, and Dr. Andrea Rose, a member of the second HC. Both stated in their depositions, in response to hypothetical scenarios posed by Cowell's counsel, that a physician without privileges to perform certain procedures, such as "intubations" and "bone marrows," could perform them in their presence since they had those specific privileges.

¶34 Second, Cowell argues that the IC failed to reasonably investigate whether she cooperated with the peer review process. She claims the IC was unaware that Cowell had explained to Kornberg in a letter dated August 3, 2000, that the nurses could not work the video equipment, that a hospital administrator was responsible for assuring that all of Cowell's procedures were videotaped during the four-month focused review in 2002, and that the September

---

[32] *Morgan*, 101 Wn. App. at 770.

2005 agreement did not require Cowell to videotape procedures herself.

¶35 Third, Cowell argues that the IC did not reasonably investigate the abscess, placenta, and JW cases, as well as her other past cases because the IC failed to review a consultation note in the abscess case, to question a nurse "in a meaningful way" about the placenta case, to fully "explore" Cowell's explanation in the JW case, and to review patient charts in other past cases.

¶36 These arguments fail because Cowell is entitled to " 'a reasonable investigation under the Act, not a perfect investigation.' "[33] Thus, the IC is not required to carry out its investigation in any particular manner; it is only required to conduct a factual investigation that is reasonable under the circumstances. The IC's investigation in this case was extensive. Under the bylaws, the IC, after receiving a request for corrective action, must issue a report of its investigation within 30 days. Here, the IC's investigation lasted approximately four and one-half months, as the IC realized during its review of Cowell's voluminous quality assurance and credentialing files that it needed more time and notified Lambert.[34] In addition to reviewing these files, the IC met with Cowell for more than four hours in two interviews to discuss the scope of her practice in terms of her privileges, her compliance with videotaping and monitoring requirements, and her management of the abscess, placenta, and JW cases, as well as other past cases.

¶37 The IC made further efforts to investigate these three areas of concern. First, in determining that Cowell had exceeded the scope of her privileges, the IC reviewed Cowell's privilege applications and records of her procedures. From these documents, it concluded that Cowell did not have privileges to perform LAVHs between 2001 and

___

[33] *Singh*, 308 F.3d at 43 (quoting *Egan v. Athol Mem'l Hosp.*, 971 F. Supp. 37, 43 (D. Mass. 1997)).

[34] The second ARC found the IC acted within the bylaws since Cowell never objected to and was not prejudiced by the duration of the investigation.

2005 and yet performed four LAVHs as the attending surgeon during that time period—facts conceded by Cowell.[35] The IC further noted that, even if another physician had been in the operating room to watch or assist Cowell, operating on a patient as an attending surgeon without privileges was a violation of the bylaws.

¶38 Second, in determining that Cowell had failed to cooperate with the peer review process, the IC noted that she was unable to produce the nine videotapes it had requested. It also traced Cowell's history of failing to produce requested videotapes of her laparoscopic procedures.[36]

¶39 Finally, in its investigation of the abscess, placenta, and JW cases, the IC reviewed the patient charts, as well as reports from four outside reviewers retained by Cowell and a report from one outside reviewer retained by the MEC. The IC also spoke with several physicians and nurses with knowledge of Cowell's clinical practice. With respect to other past cases, although the IC did not review patient charts, it examined reviews prepared by various quality assurance/peer review committees.

¶40 Cowell has neither shown that reliance on the IC's report by other reviewers in the process was unreasonable[37] nor presented evidence creating an issue of fact that might lead a reasonable jury to conclude that the fact-finding process was unreasonable.

### c. Adequate Notice and Hearing Procedures

■ ¶41 The third element of § 11112(a) requires that a physician receive adequate notice and procedures or "other

---

[35] Cowell also admitted her personal responsibility for keeping track of the scope of her privileges before the second HC.

[36] Regarding Cowell's argument that the IC exceeded the scope of its authority, the second ARC found the IC acted within the bylaws.

[37] *Mathews*, 87 F.3d at 638 (stating that reports by a preliminary investigative committee and by an outside reviewer, even though they conflicted with a report prepared by the physician's expert, were "not so obviously mistaken or inadequate as to make reliance on them unreasonable").

procedures as are fair to the physician under the circumstances."[38] GSH can comply with this element in one of two ways. It can comply with the "safe harbor" notice and procedure rules contained in 42 U.S.C. § 11112(b) or it can provide "other procedures as are fair to the physician under the circumstances."[39] Respondents claim to have complied in the second way.

¶42 Cowell contends that the procedures were neither adequate nor fair because "material information was withheld from both the MEC and the Board." Before addressing the merits of these arguments, we briefly describe the procedures provided under GSH's medical staff bylaws.

¶43 Article IV, section 6 of the bylaws outlines the procedures when a request for corrective action is filed against a physician. Under this section, the president of the medical staff, upon receiving a corrective action request, "should notify the practitioner of the specific reasons and request for corrective action." If the request could result in reduction or suspension of privileges, the president must appoint an IC. Before the IC issues its report, the physician "shall have an opportunity for an interview with the [IC]" and before the interview "shall be informed of the specific charges against him and shall be invited to discuss, explain or refute them." This interview "shall not constitute a hearing, shall be preliminary in nature, and none of the procedural rules provided in these Bylaws with respect to hearings shall apply."

¶44 Following receipt of the IC's report, the physician is permitted to request an appearance before the MEC. Like an appearance before the IC, this appearance is informal and preliminary in nature. If the MEC recommends termination of privileges, the physician is entitled to the procedural rights in article IV, section 7 of the bylaws. This section entitles a physician to one hearing before an HC, consisting of three members of the medical staff and a

---

[38] 42 U.S.C. § 11112(a)(3).

[39] 42 U.S.C. § 11112(a)(3).

hearing officer, and one appellate review before the Board. The Board may appoint an ARC, composed of at least three Board members, to conduct the appellate review. The by-laws grant the physician the right to representation by an attorney, to call and cross-examine witnesses, and to submit evidence before both the HC and ARC. When appealing to the ARC, the physician may submit written appellate statements concerning "any step in the procedure to which the appeal is related."

¶45 Cowell's complaints are directed to the fairness and adequacy of the process she received in connection with the MEC's August 7, 2006, recommendation and the Board's decision to terminate her privileges.

¶46 Her complaints regarding the MEC's recommendation lack merit. Cowell contends that the MEC meeting minutes show that Lambert misrepresented the first HC's conclusions. But the minutes do not conclusively demonstrate this. They simply summarize, without quoting, Lambert's report to the MEC. The minutes state that the first HC found that the abscess and placenta cases "by themselves would not warrant continued summary suspension. However, with the addition of the [JW] case . . . the summary suspension should be upheld." Even if we assume that these were Lambert's exact words, Cowell had the opportunity to challenge Lambert's representations, as summarized in the minutes, before subsequent reviewing panels.

¶47 Cowell also points to the deposition testimony of Dr. Donald Russell, an MEC member who stated that he was unaware that the first HC found no substantial factual basis that Cowell provided substandard care in the abscess and placenta cases.[40] But the fact that the first HC differed in its conclusions regarding Cowell's clinical competence

---

[40] Cowell also appears to argue that Russell was unaware of the second HC's findings. But the second HC's report was issued on December 29, 2006. Russell voted to terminate Cowell's privileges at the MEC's August 7, 2006, meeting.

does not establish that the process was unfair.[41] It reflects the independence of the reviewing panels. Moreover, Cowell had the opportunity to present the first HC's findings to the MEC in the time allotted to her.

¶48 Finally, Cowell contends that informal review procedures do not satisfy the HCQIA. Case law, however, indicates the contrary,[42] and Cowell fails to cite any authority in support of her position. She further ignores the medical staff bylaws which expressly state that appearances before the IC and MEC are not formal appeal procedures.

¶49 In any event, the record shows that Cowell received more than adequate notice and procedures before the MEC recommended terminating her privileges. Cowell was notified that a corrective action request had been filed against her and that the investigation prompted by the request was not limited to the placenta and abscess cases. When the IC was formed, Cowell was informed of the identity of its members. Before each of the IC's interviews, Cowell was provided with a list of questions relating to issues that included the scope of her practice in terms of her privileges and her compliance with videotaping and monitoring requirements. After receiving such notice, Cowell prepared written responses to the IC's questions and submitted reports from four outside reviewers to each IC member.

---

[41] *See Morgan,* 101 Wn. App at 773 ("[T]he fact that varying review committees differed on its conclusions does not undermine the fairness of the procedures."); *cf. Singh,* 308 F.3d at 41 ("The reversal of a peer review committee's recommendation of an adverse professional review action by a higher level peer review panel does not indicate that the initial recommendation was made without a reasonable belief that the recommendation would further quality health care."); *Austin,* 979 F.2d at 735 (holding that reversal of a medical executive committee's recommendation by a judicial review committee failed to establish that the defendants did not have a reasonable belief that the suspension was warranted).

[42] *See Morgan,* 101 Wn. App. at 772 n.4 (holding that the informal procedures used throughout the review process leading to the revocation of privileges satisfied the adequate notice and procedures element of § 11112(a)(3)); *Singh,* 308 F.3d at 30, 43-44 (holding that procedures were adequate even though the physician did not have the opportunity to challenge the results of an audit before requesting a hearing); *Smith v. Ricks,* 31 F.3d 1478, 1487 (9th Cir. 1994) (stating the HCQIA does not require "peer review proceedings to look like regular trials in a court of law").

Cowell met with the IC twice. She promptly received a copy of the IC's report, providing her further notice.[43] She was then invited to attend the August 7, 2006 MEC meeting and was given 30 minutes to respond to the IC's report. Under the circumstances, Cowell was given adequate notice and opportunity to be heard before the MEC recommended terminating her privileges.

¶50 For similar reasons, Cowell's complaints regarding the Board's decision are unavailing. Cowell cites the deposition testimony of Mr. Mike Nelson, a Board member who stated that he was unaware of favorable findings made by both the first and second HC. As stated previously, the fact that different panels reviewing the case reached different conclusions demonstrates independence—not unfairness —in the review process. Moreover, the record establishes that Cowell had ample opportunity to present the findings of both HCs to the second ARC. In two appellate statements, Cowell discussed both HC's findings and extensively quoted the second HC's findings. Accordingly, the second ARC expressly acknowledged in its report that the second HC had found that there was insufficient evidence to support findings that Cowell provided substandard care. Significantly, the second ARC went on to note that the second HC nonetheless recommended termination of all of Cowell's surgical privileges based on her failure to practice within the scope of her privileges and to cooperate with the peer review process. Cowell's failure to mention this aspect of the second HC's report further undermines her argument that closer examination of this report's findings would have led the Board to a different conclusion.

¶51 Cowell repeats her contention that the review process should resemble formal trial and appellate court proceedings. In oral argument, counsel for Cowell compared the Board to an appellate court and stressed that Cowell did not have an opportunity to further challenge the second

---

[43] In oral argument, Cowell conceded that she had received notice of the charges regarding the scope of her practice and cooperation with the peer review process when she received a copy of the IC's report.

ARC's recommendation before it was adopted by the Board. But the Board's delegation of fact-finding does not violate the requirements of the HCQIA.[44] Indeed, the HCQIA does not require any level of appellate review.[45]

¶52 Furthermore, consistent with the bylaws, Cowell received more than adequate notice and procedures before the Board decided to terminate her privileges. After the MEC's recommendation, Cowell was informed of her right to a hearing. She requested and received a hearing before a second HC, comprised of three members of the medical staff and a hearing officer, who was a retired superior court judge. At the seven-day hearing before it, Cowell was represented by counsel, called and cross-examined witnesses, and presented evidence. The second HC stated that it considered the testimony of witnesses at the hearing, prior witness testimony, witness declarations and statements, documentary exhibits, extensive opening statements and closing arguments, and posthearing submissions.

¶53 Following the second HC's decision, Cowell was notified of her right to appeal that decision. She requested and received appellate review. Before a second ARC composed of three Board members, Cowell was represented by counsel, called and cross-examined witnesses, and presented evidence. In formulating its recommendation to the Board, the second ARC stated that it considered the record created before the second HC:

> [T]he Appellate Review Committee is to review the recommendation(s) of the Hearing Committee and to determine whether the decision and recommendation were justified and not arbitrary and capricious. To this end, the Appellate Review Committee reviewed the record created before the Hearing Com-

---

[44] *See Bender v. Suburban Hosp., Inc.*, 134 Md. App. 7, 43, 758 A.2d 1090 (2000) ("There is nothing irregular about a high-level reviewing body leaving the detailed fact-finding efforts to a lower-level hearing panel or committee."); *see also Singh*, 308 F.3d at 44; *Smith*, 31 F.3d at 1487.

[45] *Ne. Ga. Med. Ctr., Inc. v. Davenport*, 272 Ga. 173, 176, 527 S.E.2d 548 (2000) (quoting *Sugarbaker*, 190 F.3d at 915).

mittee during the fair hearing on the Medical Executive Committee's recommendation of termination of all [Cowell's] clinical privileges at Good Samaritan Hospital. This record consisted of the verbatim transcript of the testimony of the witnesses and the opening statements and closing arguments of counsel for the parties. The record also consisted of the exhibits offered and admitted during the course of the fair hearing.

The ARC further stated that it reviewed two appellate statements submitted by Cowell, a response statement submitted by Lambert, and a rebuttal statement by Cowell. The second ARC also heard oral presentations from both sides. Finally, as required under the bylaws, the second ARC gave equal weight to the MEC's and second HC's recommendations in concluding that Cowell's failure to engage with the peer review process and to practice within the scope of her privileges warranted termination of all privileges.

¶54 Cowell has failed to raise an issue of fact as to whether she was provided with notice and procedures that were fair and adequate under the circumstances.

 d. Reasonable Belief that the Action Was Warranted by the Facts Known after Such Reasonable Efforts to Obtain Facts and after Adequate Notice and Procedures

¶55 Analysis under the fourth element of § 11112(a) closely tracks the analysis under the first element.[46] As discussed above, the MEC's recommendation and the Board's decision to terminate Cowell's privileges were well supported and focused on patient care. The record also establishes that Cowell received adequate notice and procedures in accordance with medical staff bylaws. Cowell did not present evidence creating a material issue of fact as to whether respondents acted with the reasonable belief that termination of her privileges was warranted by known facts.

---

[46] *Morgan*, 101 Wn. App. at 773.

## 2. Immunity under § 11111(a)(2)

¶56 Cowell contends that respondents Lambert, Snodgrass, Lien, Wong, Waterland, Taggart, Smith, and Wright are not entitled to HCQIA immunity because they provided false information with knowledge of its falsity in violation of § 11111(a)(2). This section provides a separate ground for immunity for these respondents, as it applies to individuals "providing information to a professional review body regarding the competence or professional conduct of a physician . . . unless such information is false and the person providing it knew that such information was false." We need not consider whether these respondents are entitled to immunity under § 11111(a)(2) because we have already determined that they are entitled to immunity as either members of a professional review body or individuals assisting a professional review body under the § 11112(a) analysis.[47]

## 3. Immunity under § 11137(c)

 ¶57 Section 11137(c) provides immunity for any entity that makes a report to the NPDB "without knowledge of the falsity of the information contained in the report." GSH is therefore immune from liability unless "there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false."[48]

 ¶58 Here, Cowell claims that GSH should not receive immunity because the NPDB report states that the Board "affirmed the recommendation to terminate physician's privileges based in part on a determination that physician's conduct of practicing beyond the scope of her

---

[47] *See Singh v. Blue Cross & Blue Shield of Mass., Inc.*, 182 F. Supp. 2d 164, 175 (D. Mass. 2001). Moreover, the discrepancies pointed out by Cowell, such as representations made by Lambert to the MEC and by the IC members in their report, are insufficient to establish that these respondents made false statements with knowledge of their falsity.

[48] *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1334 (10th Cir. 1996).

privileges and non-cooperative approach to the peer review process was detrimental to the health and safety of patients." Relying on *Brown v. Presbyterian Healthcare Services*,[49] Cowell focuses on the phrase "in part" and argues that this statement "clearly conveys the false defamatory meaning that Dr. Cowell's privileges were partly revoked because of deficiencies in her clinical care."

¶59 *Brown*, however, is distinguishable. There, a report was made to the NPDB stating that Brown's obstetrical privileges had been suspended for incompetence, malpractice, and negligence.[50] But the peer review panel had suspended Brown for breaching an agreement to obtain appropriate consultation.[51] Neither the review panel nor the hospital Board of Trustees ever found Dr. Brown negligent, incompetent, or guilty of malpractice. Therefore, the record presented sufficient evidence for a jury to find the report was false and the defendant who had made the report knew it was false.[52]

¶60 Here, the reasons stated by GSH in support of its decision are the same as those reported to the NPDB. The words "in part" do not make the report false. These two words communicate nothing about Cowell's clinical care. Nor do these words establish that GSH submitted the report with knowledge of its falsity.

## B. Ruling on Striking Transcripts

¶61 Cowell contends that the trial court erred in striking the transcripts of Cowell's interviews with the IC on grounds that these interviews were private conversations within the meaning of RCW 9.73.030(1)(b).[53] Any error the court might have committed in striking the

---

[49] 101 F.3d 1324 (10th Cir. 1996).

[50] *Brown*, 101 F.3d at 1334.

[51] *Brown*, 101 F.3d at 1334.

[52] *Brown*, 101 F.3d at 1334.

[53] RCW 9.73.030(1)(b) provides, "Except as otherwise provided in this chapter, it shall be unlawful for any individual . . . to intercept, or record any . . . [p]rivate

transcripts is harmless since the transcripts raise no question of fact concerning compliance with any of the four elements of 42 U.S.C. § 11112(a).

C. Attorney Fees

¶62 Cowell argues that the trial court abused its discretion in awarding fees and costs to respondents for defending against Cowell's claims for injunctive relief under RCW 7.71.030 and for damages under 42 U.S.C. § 11113. We review an award for attorney fees for an abuse of discretion.[54]

¶63 Cowell first argues that an award under RCW 7.71.030 was unjustified because she was "merely testing the scope of a statute on which there is no law" and because her request for injunctive relief was only a "small part" of her complaint and amended complaint. Under RCW 7.71.030(3), "[r]easonable attorneys' fees and costs as approved by the court shall be awarded to the prevailing party, if any, as determined by the court." Accordingly, the trial court awarded respondents, as the prevailing parties, $290,656.50 in fees and $18,888.50 in costs under RCW 7.71.030. The court found Cowell's claims for damages and injunctive relief relied on "a common core of facts and circumstances." The court also found the time spent on the two separate legal theories that were applied to this common factual core was segregated and that fees related to work on theories on which respondents did not prevail were excluded. Finally, the court found that the amount of time spent by respondents' counsel and the discounted hourly rates at which most of the time was billed were reasonable. The record supports these findings, and RCW 7.71.030 authorizes the award of reasonable fees and cost to respondents. This award included fees incurred developing the common factual core and presenting the legal theories related to the request for injunctive relief only.

conversation . . . without first obtaining the consent of all persons engaged in the conversation."

[54] *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 65, 738 P.2d 665 (1987).

¶64 Cowell next argues that an award was inappropriate under § 11113 because her HCQIA claims involved questions of first impression and were not frivolous. Under § 11113, a defendant should receive an award of costs and fees when (1) the defendants are persons covered by the HCQIA; (2) the elements under § 11112(a) were met; (3) the defendants substantially prevailed; and (4) the plaintiff's claim or conduct during the litigation was frivolous, unreasonable, without foundation, or in bad faith. Here, the court awarded $69,132.50 in fees and $4,600.00 in costs under § 11113 because respondents met all of these requirements. In particular, the court held that Cowell's legal arguments that respondents failed to satisfy the elements under § 11112(a) and her decision "to issue hundreds of written discovery requests and to take more than fifty depositions in pursuit of her claims [were] unreasonable." On this record, we cannot say that the court abused its discretion in awarding fees under § 11113.[55]

¶65 Finally, respondents request fees on appeal under RAP 18.1 and § 11113. While respondents have prevailed on appeal, Cowell's appeal is not frivolous, unreasonable, without foundation, or in bad faith. We therefore deny respondents' request.

## Conclusion

¶66 Cowell did not offer evidence creating an issue of material fact as to whether the actions taken by respondents satisfy the immunity elements under the HCQIA. Accordingly, respondents are immune for suspending and terminating Cowell's privileges. Any error the court may have committed in striking the transcripts is harmless.

---

[55] *See Meyers*, 341 F.3d at 473 ("Whether a party's claim or conduct is frivolous, unreasonable, or without foundation is a question committed to the sound discretion of the district court." (citing *Johnson v. Nyack Hosp.*, 964 F.2d 116, 123 (2d Cir. 1992))).

944

The court also did not err in awarding fees and costs to respondents.

¶67 Affirmed.

BECKER and LAU, JJ., concur.

Review denied at 169 Wn.2d 1002 (2010).