269 P.3d 323 (2012)
165 Wn. App. 837
Diana P. SMIGAJ, M.D. and Cascade Women's Healthcare Associates, P.L.L.C., Appellants,
v.
YAKIMA VALLEY MEMORIAL HOSPITAL ASSOCIATION, Richard W. Linneweh, Jr., an individual, Richard W. Linneweh, Jr. and Jane Doe Linneweh, Jr., a marital community, Roger Rowles, M.D., an individual, Carl Olden, M.D., an individual, and Carl Olden, M.D. and Jane Doe Olden, a marital community, Respondents.
No. 29415-3-III.
Court of Appeals of Washington, Division 3.
January 10, 2012.
*326 Lawrence Ronald Cock, Cable Langenbach Kinerk & Bauer LLP, Seattle, WA, Robert Nelson Meals, Law Office of Robert N. Meals PLLC, Langley, WA, for Appellants.
Greg Montgomery, Miller Nash LLP, Seattle, WA, for Respondents.
KULIK, C.J.
¶ 1 The Perinatal Quality Assurance Committee (PQAC), a peer review committee at Yakima Valley Memorial Hospital, recommended the suspension of Dr. Diana Smigaj's hospital privileges. Dr. Brian Padilla, the medical chief of staff, agreed, and notified Dr. Smigaj that her hospital privileges were suspended as of September 5, 2008. Dr. Smigaj's hospital privileges were reinstated by the medical executive committee (MEC) on September 16, subject to an external review of her cases for the following three month period. The reinstatement of Dr. Smigaj's privileges was not retroactive.
¶ 2 Dr. Smigaj filed a lawsuit against Yakima Valley Memorial Hospital, various doctors and administrators (collectively Memorial), challenging her 11-day suspension. The *327 court granted Memorial's motion for summary judgment, dismissing all of Dr. Smigaj's claims. On appeal, Dr. Smigaj argues that the trial court erred by (1) granting Memorial immunity under the Health Care Quality Improvement Act of 1986 (HCQIA),[1] (2) dismissing Dr. Smigaj's claims under CR 12(c) and RCW 7.71.030, (3) dismissing her defamation action, and (4) awarding attorney fees to Memorial in the amount of $534,415.
¶ 3 We conclude that RCW 7.71.020, the HCQIA, applies here because the professional review action related directly to Dr. Smigaj's competence and conduct. And a reasonable jury could conclude that Dr. Smigaj has shown, by a preponderance of the evidence, that Memorial's professional review action did not meet two of the elements required for immunity. We, therefore, reverse the summary judgment and remand for trial. The trial court properly dismissed Dr. Smigaj's defamation claim concerning Memorial's September 25, 2008 letter to Group Health, based on Dr. Smigaj's failure to show damages.

FACTS
¶ 4 Dr. Diana Smigaj is a board-certified obstetrician/gynecologist (ob/gyn) who is also board certified in maternal-fetal medicine (perinatology). In 2000, Dr. Smigaj incorporated her private practice as Cascade Women's Healthcare Associates.
¶ 5 Richard W. Linneweh, Jr., has been the chief executive officer (CEO) of Memorial since the mid-1970s. Kay Anyan is Memorial's director of medical staff services. She works for Mr. Linneweh and provides administrative services to medical staff committees and physicians. She attends PQAC meetings as Memorial's representative.
¶ 6 In 1999, Mr. Linneweh appointed Dr. Roger Rowles as chairman of the PQAC. Dr. Rowles is a board-certified ob/gyn who has practiced in Yakima since 1979. PQAC is a medical quality improvement peer review committee. One of the duties of PQAC is to "improve performance by assessing problems, processes, and outcomes of care, reaching conclusions and making recommendations to the practitioners or departments involved." Clerk's Papers (CP) at 512. PQAC consists of five physicians, who are voting members, and various ex-officio members who do not vote.
¶ 7 Dr. Carl Olden is a family physician who Mr. Linneweh appointed to be Memorial's director of quality assurance. Dr. Olden attended PQAC meetings as Memorial's medical director for quality assurance.
¶ 8 May 30. 2008 PQAC Meeting. On May 30, 2008, PQAC reviewed the case of patient JA who had been transferred to Dr. Smigaj's care by a physician in Sunnyside, Washington.
¶ 9 JA was 16 years old and was transferred to Memorial because of her high risk pregnancy. She was 32 weeks pregnant and suffering from preeclampsia involving severe headaches, elevated protein levels, and high blood pressure. The patient was admitted to Memorial at approximately 7:00 p.m., but was not seen by Dr. Smigaj until approximately 6:00 a.m. the following morning. During this period, Dr. Smigaj gave the nursing staff telephone orders to initiate induction.
¶ 10 About 4:00 a.m., after hearing reports of problems of a nonreassuring fetal heart rate tracing, Dr. Smigaj gave the nursing staff orders to rupture the patient's membranes and place a fetal heart rate monitor. Implementation of this order required the artificial rupture of the patient's membranes, which, under medical staff policy, was outside the scope of nursing practice. Dr. Smigaj was called to the hospital at about 5:00 a.m. because of concerns over the fetal heart rate. She delivered the infant by cesarean section by 7:25 a.m.
¶ 11 June 20 PQAC Meeting. By letter of June 13, 2008, PQAC advised Dr. Smigaj of its review of the JA case and invited her to attend a special meeting on June 20. Dr. Smigaj did not deny that she could have seen the patient earlier, but she objected to being *328 criticized for not seeing the patient within one hour when this was not an official policy and had not been required of other ob/gyns. Dr. Smigaj did not accept PQAC's suggestion that she should have seen this patient shortly after admission and that she should have confirmed the fetal position before initiating induction. Dr. Smigaj informed PQAC that she would not voluntarily adopt this practice, but that she would adopt this practice if PQAC promulgated a policy.
¶ 12 After Dr. Smigaj left the meeting, PQAC discussed various disciplinary measures. Dr. Smigaj was not informed that the meeting continued and that disciplinary measures were discussed.
¶ 13 Following this meeting, members of PQAC were concerned about what they viewed to be unacceptably poor clinical judgment represented by the JA case and what PQAC perceived to be Dr. Smigaj's failure to appreciate the seriousness of her deficiency. PQAC members felt that a formal policy should not be required to remind a physician that a high-risk obstetrical patient like JA needed to be seen promptly.
¶ 14 Beginning on June 20, PQAC was designated as an "ad hoc committee" to investigate Dr. Smigaj's practice.
¶ 15 July 9 PQAC Meeting. At this meeting, Ms. Anyan provided PQAC with two timelines containing quality review activities from Dr. Smigaj's file from 1995 to 2008. Dr. Rowles and Dr. Olden presented four examples of what they claimed highlighted poor practice patterns; (1) Dr. Smigaj's extended proctoring period required in 1995 and 1997 through 1998; (2) a case in December 2004 involving a massive hemorrhage where Dr. Smigaj complied with eight conditions that were imposed; (3) a case in 2007 involving a hemorrhage following a caesarian section where additional training was recommended; and (4) several disruptive physician reports that were not shown or explained to PQAC members, but which reportedly involved yelling.
¶ 16 PQAC discussed five disciplinary measures, including reduction of privileges to midwifery level and removal of privileges. Ms. Anyan explained that if PQAC recommended a reduction of privileges, legal counsel would have to be contacted and the JA case records would have to be sent to an external reviewer.
¶ 17 Dr. Smigaj testified later that the two timelines omitted certain positive information in her file. In her view, Mr. Linneweh imposed the proctoring to disparage her competence. Dr. Smigaj pointed out that none of the physicians who proctored her had any criticism of her management of patients. She also stated that she had complied with the eight conditions imposed by Dr. Olden and Dr. Rowles. Dr. Smigaj asserts the case involving the hemorrhage following a caesarian section had been well managed and had been misrepresented to PQAC. She also stated that the disruptive physician reports were never shown or explained to PQAC.
¶ 18 July 16 Letter. On July 16, Dr. Rowles wrote to Dr. Smigaj informing her of the July 9 meeting, PQAC's concerns, and the decision to engage an external reviewer. PQAC asked Dr. Smigaj to provide a written response to PQAC concerns and to voluntarily agree not to accept transfer of patients until PQAC's review of the JA case was completed. Dr. Smigaj would not agree to refuse further transfer patients but she did agree to see all such patients within one hour of admission, to immediately prepare a history and physical, and to consult with Dr. Rowles regarding her management plan for these patients. In this way, any problems with the JA case were resolved.
¶ 19 July 21 PQAC Meeting. After this meeting, Dr. Rowles wrote to Dr. Smigaj informing her of this meeting and its purpose of considering "appropriate interim precautionary steps pending ongoing evaluation of your clinical practice." CP at 2893.
¶ 20 Dr. Tomlinson. In late July, Memorial hired Dr. Mark Tomlinson, an ob/gyn perinatologist in Portland, to perform an independent review of JA's records. Dr. Tomlinson spoke with PQAC by conference call on July 30. Dr. Smigaj was not present.
¶ 21 Dr. Tomlinson told PQAC that he had two areas of concern. The first area of concern was Dr. Smigaj's failure to see the patient before initiating the induction. Dr. *329 Tomlinson stated that the patient deserved a personal evaluation and that Dr. Smigaj should have evaluated the status and position of the infant before induction. Dr. Tomlinson's second area of concern involved the nursing staff's failure to contact Dr. Smigaj about the poor fetal heart rate monitor tracing. At his deposition, Dr. Tomlinson testified that when he identified an area of concern, it was the same as saying that the performance fell below the standard of care.
¶ 22 PQAC wrote to Dr. Smigaj informing her that it had met to consider her written responses, the conference call with Dr. Tomlinson, and the report by Dr. Mize Connor, which had been provided by Dr. Smigaj.
¶ 23 August 13 Conference Call. On August 8, Ms. Anyan sent the records of WC, another patient of Dr. Smigaj, to Dr. Tomlinson for review.
¶ 24 WC was admitted to Memorial with complaints of back pain and vaginal discharge. WC was about 25 weeks pregnant. Initial monitoring indicated contractions. A cervical examination revealed ruptured membranes and feet present in the cervix. An ultrasound confirmed a footling breech presentation of the fetus.
¶ 25 Dr. Smigaj saw WC and arranged for her to be transported to the University of Washington Hospital because of the age of the fetus. Dr. Smigaj left the hospital. As transport preparations were being made, the patient began to complain of contractions. A vaginal exam revealed legs in the vagina, indicating an imminent breech delivery. A family practitioner and a midwife delivered the breech, but the head became trapped. Dr. Smigaj returned to the hospital. Incisions were made in the cervix and the head was ultimately freed. Efforts to resuscitate the infant were unsuccessful.
¶ 26 In an August 13 conference call, Dr. Rowles, Dr. Olden, and Ms. Anyan discussed the WC case with Dr. Tomlinson. Dr. Rowles testified that PQAC requested a written report from Dr. Tomlinson without, apparently, giving any specific deadline for the report.
¶ 27 August 15 PQAC Meeting. At this meeting, PQAC considered the care provided to JA, WC, and a third patient, LH.
¶ 28 Information concerning the telephone conversation with Dr. Tomlinson about the WC case was presented to PQAC. Presumably, this information was presented by Dr. Rowles. The minutes of the meeting reflect that Dr. Tomlinson had concerns about the accuracy of the determination that WC was not in labor. However, Dr. Tomlinson stated that if the physician determined that the patient was not in labor, the transport decision was appropriate. Dr. Tomlinson did conclude that Dr. Smigaj should have remained with the patient until the transport arrived and that she should have considered a consultation with an onsite neonatologist prior to transport. Dr. Tomlinson determined that the management of the patient's hypertension in the office setting did not meet the standard of care. However, Dr. Smigaj later testified that her office notes showed that WC refused treatment.
¶ 29 PQAC agreed on five concerns related to the WC case that required a written response from Dr. Smigaj.
¶ 30 Dr. Smigaj contends that Dr. Rowles misrepresented the facts when he told PQAC that Dr. Smigaj provided substandard care to WC. She maintains that Dr. Tomlinson's written report does not support PQAC's allegations. Dr. Smigaj states that she told PQAC twice that WC refused treatment of her hypertension.
¶ 31 At the August 15 meeting, information was also presented about the LH case. Dr. Smigaj saw LH six days before she delivered. At that time, Dr. Smigaj concluded that the fetal position was head down. Fetal position was not checked again when, six days later, Dr. Smigaj ordered that induction be initiated. The fetus was in a breech position and a difficult delivery followed. The infant was flaccid when delivered but was resuscitated with the help of a neonatal intensive care unit nurse and others.
¶ 32 PQAC also considered a compilation of minutes taken at its meetings from 1999 through 2008 that included consideration of Dr. Smigaj's cases. Following the conclusion *330 of the August 15 meeting, Dr. Rowles wrote to Dr. Smigaj informing her of the meeting and the review of the WC and LH cases. Dr. Rowles asked her to provide written responses to PQAC's concerns about the cases and to attend the PQAC meeting on August 29.
¶ 33 August 29 PQAC Meeting. At this meeting, Dr. Smigaj explained her care of WC and LH and provided copies of an independent evaluation of both cases by Dr. Connor, an ob/gyn in Bellevue, Washington. In Dr. Connor's opinion, nothing in Dr. Smigaj's management of either case deserved criticism.
¶ 34 Dr. Smigaj contends that after she left the meeting, Dr. Rowles added two more criticisms of the LH case. The two criticisms concerned: (1) Dr. Smigaj's failure to use Piper forceps to facilitate the delivery of LH's infant, and (2) her decision to perform an induction on an allegedly unripe cervix.
¶ 35 September 3 PQAC Meeting. On September 2, Ms. Anyan sent the records in the LH case to Dr. Tomlinson. This case had been presented to PQAC on August 15. On September 3, Dr. Tomlinson spoke by telephone with Ms. Anyan. Dr. Tomlinson stated that he had no criticism of Dr. Smigaj's work on the case.
¶ 36 At the September 3 meeting, Ms. Anyan reported that Dr. Tomlinson said that substandard care was provided to LH but she did not clarify that Dr. Tomlinson was critical of the nursing staff, not Dr. Smigaj. Ms. Anyan stated that she believed PQAC understood that Dr. Smigaj had not provided substandard care.
¶ 37 PQAC felt that the three casesJA, WC and LHreflected poor clinical judgment. PQAC concluded that these cases, combined with past quality issues reviewed by PQAC, reflected a continuing pattern of quality concerns including poor judgment; deficiencies in knowledge, surgical skills, and communication skills; and an inability to learn from previously identified poor practice patterns.
¶ 38 PQAC unanimously approved a motion that Dr. Smigaj's continued practice constituted an unacceptable risk to patients. PQAC recommended a precautionary suspension while proceeding forward with an external review of all of Dr. Smigaj's current and past cases raising quality concerns. PQAC directed Ms. Anyan to forward the recommendation to the chief of the medical staff, Dr. Padilla.
¶ 39 September 4 Suspension. Ms. Anyan presented Dr. Padilla with a letter drafted by Memorial's attorneys. Dr. Padilla notified Dr. Smigaj that her privileges were suspended as of 12:01 a.m. on September 5, 2008. Before making his decision, Dr. Padilla reviewed the reports from Dr. Tomlinson and Dr. Connor, and the minutes of PQAC meetings. On the morning of September 4, Dr. Padilla discussed the PQAC recommendation with Dr. Rowles. Dr. Padilla called Dr. Smigaj and informed her of the suspension. He told Dr. Smigaj that he would initiate further review. He also advised her that the MEC meeting to review the precautionary suspension would be held on September 16. Dr. Padilla invited her to attend.
¶ 40 September 16 MEC Meeting. Prior to the September 16 meeting, Dr. Padilla directed that all material regarding this matter be taken to the MEC office where it could be reviewed by MEC members. He also called each voting member and urged him or her to review the materials. Almost all of the voting members reviewed the materials before the meeting.
¶ 41 At the meeting, Dr. Rowles explained the PQAC recommendation. Dr. Smigaj requested that the decision be nullified.
¶ 42 In the following discussion, Dr. Kevin Harrington, chair of Memorial's ob/gyn department, stated that he did not believe the suspension was justified. He proposed a compromise under which MEC would lift the suspension and reinstate Dr. Smigaj's privileges, not retroactively as she requested, but effective September 16, subject to an external review of each of her cases for a three month period following the reinstatement. The MEC approved the compromise with the additional recommendations that Dr. Smigaj see transfer patients in a timely manner, that she remain with her patients being transferred from Memorial until the transport arrived, *331 and that she consult with a neonatologist on high-risk obstetric patients.
¶ 43 Three Month External Review. Dr. Smigaj was immediately informed that her privileges at Memorial had been reinstated. The external review performed as a condition of reinstatement involved 35 cases. The reviewers judged four cases to have significant deviation from the standard of care and two more to have minor deviations.
¶ 44 Group Health. On September 25, Memorial responded to an inquiry from Group Health by indicating that the suspension of Dr. Smigaj's privileges was imposed as of September 5 based on three cases, meetings with Dr. Smigaj, and the opinions of external experts. Memorial stated that the MEC voted unanimously to reinstate Dr. Smigaj effective September 16 and directed external review of her cases from September 16 to December 17.
¶ 45 Litigation. Dr. Smigaj filed a complaint seeking damages, declaratory, and injunctive relief. She alleged the suspension was arbitrary and capricious; illegal because it was motivated by gender discrimination and anticompetitive animus; void because Memorial did not follow its by-laws and rules; a breach of contract; a violation of common law right to fair procedure; the result of a sham peer review; a breach of fiduciary duty; a tortious interference with a business expectancy; a violation of the Consumer Protection Act, chapter 19.86 RCW; and defamatory.
¶ 46 Memorial filed a motion to dismiss based on RCW 7.71.030(1), which provides an exclusive remedy for professional review actions "not related to the competence or professional conduct of a health care provider." Memorial contended that Dr. Smigaj's suspension was not related to physician competence because Dr. Smigaj's complaint alleged the suspension was based on discrimination and unfair treatment by Memorial. The court denied Memorial's motion, concluding that "the court must focus on the action taken by the professional review body, not Dr. Smigaj's allegations." CP at 193.
¶ 47 Memorial later renewed its RCW 7.71.030 argument in a motion for judgment on the pleadings under CR 12(c). Memorial also filed a motion for summary judgment asserting immunity under HCQIA. Dr. Smigaj filed a motion for judgment as a matter of law. The court, applying HCQIA immunity, granted summary judgment in favor of Memorial. The court dismissed Dr. Smigaj's complaint under CR 12(c), determining that RCW 7.71.030 precluded any of Dr. Smigaj's remaining causes of action where immunity had not been granted. The trial court awarded attorney fees to Memorial in the amount of $534,415. This appeal follows.

ANALYSIS
¶ 48 Chapter 7.71 RCW. In 1986, Congress enacted the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§ 11101-11152, to improve medical care by encouraging physician self-regulation by granting immunity from suits for money damages to participants in professional peer review actions. Mathews v. Lancaster Gen., Hosp., 87 F.3d 624, 632 (3d Cir.1996). HCQIA provides immunity from damages to participants in a professional review action if the action satisfies the four elements of 42 U.S.C. § 11112(a). Significantly, HCQIA creates a presumption that a peer review action meets the four elements unless the plaintiff rebuts this presumption by a preponderance of the evidence. Cowell v. Good Samaritan Cmty. Health Care, 153 Wash. App. 911, 925-26, 225 P.3d 294 (2009).
¶ 49 Washington's legislature adopted the HCQIA by enacting the Washington health care peer review act, codified at chapter 7.71 RCW. RCW 7.71.010 recognizes the benefits of peer review and allows only those actions prescribed in RCW 7.71.020 and .030. When adopting RCW 7.71.020,[2] the legislature incorporated HCQIA (codified as 42 U.S.C. § 11101-11152). Under RCW 7.71.020/ HCQIA, immunity from damages is granted to participants of peer review actions based on physician competence and professional conduct. RCW 7.71.020 achieves its purpose by granting immunity to peer review participants. *332 This provision does not create a new cause of action.
¶ 50 While RCW 7.71.020 provides a grant of immunity for professional review actions based on competence and professional conduct, RCW 7.71.030(1) provides the exclusive remedy for peer review actions "found to be based on matters not related to the competence or professional conduct of a health care provider." (Emphasis added.) Significantly, actions allowed under RCW 7.71.030 are limited to appropriate injunctive relief, and damages are allowed only for lost earnings directly attributable to the action taken by the professional review body.
¶ 51 The trial court concluded that Dr. Smigaj failed to rebut Memorial's presumed HCQIA immunity under RCW 7.71.020. Applying RCW 7.71.030, the court dismissed Dr. Smigaj's claim for injunctive relief and barred all of her common law and statutory claims alleging that Memorial had misused the peer review process for anticompetitive purposes unrelated to patient care.
¶ 52 In making its decision, the trial court focused on Dr. Smigaj's allegations concerning anticompetitive motives. But the applicability of RCW 7.71.020 and .030 depends on the nature of the peer review action. HCQIA defines "professional review action" as "an action or recommendation of a professional review body ... which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges... of the physician." 42 U.S.C. § 11151(9) (emphasis added).
¶ 53 42 U.S.C. § 11151(9) further provides that an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on (A) a physician's association with a professional society, (B) a physician's fees or advertising, (C) a physician's participation in certain types of health plans, (D) a physician's association with a private group practice, or (E) any other matter that does not relate to the competence or professional conduct of a physician.
¶ 54 A "professional review action" applies to an action or recommendation of a professional review body taken in response to the physician's competence or professional conduct. Morgan v. PeaceHealth, Inc., 101 Wash.App. 750, 768, 14 P.3d 773 (2000). An "announcement of a change in a physician's status is inherently part of the `professional review action' protected by the HCQIA." Gabaldoni v. Wash., County Hosp. Ass'n, 250 F.3d 255, 260 n. 4 (4th Cir.2001).
¶ 55 Here, the letter of suspension stated that the professional review action was due to poor clinical judgment in three cases, a misleading dictation in a patient chart, and disruptive practitioner reports. The complaint asserts many causes of action, but these claims arise from the peer review decision based on conclusions relating to Dr. Smigaj's clinical competence and conduct as a physician. As a result, Dr. Smigaj's claims must be reviewed under RCW 7.71.020.
¶ 56 HCQIARCW 7.71.020 Immunity. HCQIA creates a presumption that a peer review decision meets the four elements of 42 U.S.C. § 11112(a) unless the plaintiff rebuts this presumption by a preponderance of the evidence. Cowell, 153 Wash.App. at 925-26, 225 P.3d 294. The four elements are: (1) the professional review action was taken in the reasonable belief that it was in furtherance of quality health care, (2) the professional review decision was made after a reasonable effort to obtain the facts, (3) the physician received adequate notice and procedures that are fair under the circumstances, and (4) the respondents acted in the reasonable belief that, under the facts known, the suspension was warranted. Id. (quoting 42 U.S.C. § 11112(a)) These four elements are measured by the objective belief standard that examines the totality of the circumstances. Cowell, 153 Wash.App. at 925, 225 P.3d 294.
¶ 57 This rebuttable presumption changes the standard on summary judgment by assigning to Dr. Smigaj the burden of establishing that Memorial did not meet the requirements for immunity. Morgan, 101 Wash.App. at 766-67, 14 P.3d 773. Hence, this court, viewing the evidence in the light *333 most favorable to Dr. Smigaj, must determine whether Dr. Smigaj has demonstrated that a reasonable jury could conclude, by a preponderance of the evidence, that Dr. Smigaj's suspension did not satisfy each of the four elements of 42 U.S.C. § 11112(a). See Cowell, 153 Wash.App. at 926, 225 P.3d 294.

ELEMENT 1
¶ 58 The inquiry under the first element of 42 U.S.C. § 11112(a)(1) examines whether the professional review action was taken "in the reasonable belief that the action was in the furtherance of quality health care." On summary judgment, Dr. Smigaj must show that a reasonable jury could conclude by a preponderance of the evidence that the facts were insufficient to support a reasonable belief that the suspension of her privileges was in furtherance of quality health care.
¶ 59 The reasonable belief standard is satisfied if an objective view of the record discloses sufficient support for the committee's decision. Ritten v. Lapeer Reg'l Med. Ctr., 611 F.Supp.2d 696, 728 (E.D.Mich.2009). Significantly, the factual basis for a peer review action is sufficient unless the information relied upon "was so obviously mistaken or inadequate such as to make reliance on it unreasonable." Fox v. Parma Comty. Gen. Hosp., 160 Ohio App.3d 409, 418, 2005-Ohio-1665, 827 N.E.2d 787; see Cowell, 153 Wash. App. at 933 n. 37, 225 P.3d 294. The presumption of immunity is not rebutted by proof that the standard of care was met or that the reviewers reached an incorrect conclusion. McLeay v. Bergan Mercy Health Sys. Corp., 271 Neb. 602, 612, 714 N.W.2d 7 (2006).
¶ 60 At the time PQAC recommended the precautionary suspension of Dr. Smigaj's clinical privileges, PQAC relied primarily on the JA, LH, and WC cases.
¶ 61 Applying the reasonable belief standard, we conclude that Dr. Smigaj has failed to demonstrate by a preponderance of the evidence that Memorial's professional review action was not made in the reasonable belief that it was in furtherance of quality health care.

ELEMENT 2
¶ 62 The second element of immunity asks whether the decision to recommend a precautionary suspension was made after a reasonable effort to obtain the facts. 42 U.S.C. § 11112(a)(2). The relevant inquiry under the second element "is whether `the totality of the process leading up to the professional review action evidenced a reasonable effort to the obtain the facts,'" not a perfect effort. Cowell, 153 Wash.App. at 931, 225 P.3d 294 (quoting Morgan, 101 Wash. App. at 770, 14 P.3d 773). Accordingly, the court, taking all of the evidence in the light most favorable to Dr. Smigaj, must determine whether Dr. Smigaj provided sufficient evidence to permit a jury to find, by a preponderance of the evidence, that Memorial failed to make a reasonable effort to obtain the facts of the matter. See 42 U.S.C. § 11112(a)(2).
¶ 63 In order to rebut the presumption of reasonableness, Dr. Smigaj must show that the fact-finding process conducted by Memorial was not objectively reasonable. See Poliner v. Texas Health Sys., 537 F.3d 368, 379-80 (5th Cir.2008). Mere reliance on a report or an asserted fact is not sufficient; a thorough investigation is required. See Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1333-34 (10th Cir.1996). The court must consider the totality of the process culminating in the professional review action. Cowell, 153 Wash.App. at 931, 225 P.3d 294.
¶ 64 Dr. Smigaj asserts that PQAC and Dr. Padilla were given incomplete and incorrect information when making the decision to suspend her hospital privileges. Dr. Smigaj contends Memorial conducted its effort with preconceived conclusions and false information. Dr. Smigaj points out that Dr. Tomlinson, an external reviewer, did not communicate directly with PQAC about the LH and WC cases. Dr. Smigaj asserts that Dr. Rowles and Ms. Anyan incorrectly informed PQAC that Dr. Tomlinson concluded that Dr. Smigaj's care of these patients was substandard. Dr. Smigaj also states she was not provided with copies of Dr. Tomlinson's reports.
*334 ¶ 65 PQAC relied primarily on three casesJA, WC, and LHthat were evaluated by Dr. Tomlinson. Regarding JA, during a conference call, Dr. Tomlinson told PQAC that Dr. Smigaj delivered substandard care. Dr. Smigaj was aware of Dr. Tomlinson's concerns, and the parties worked out an agreement where Dr. Smigaj agreed to see transport patients within one hour.
¶ 66 Importantly then, PQAC relied on Dr. Tomlinson's review of the LH and WC cases but PQAC never interviewed him about these cases and did not obtain his reports on these cases until after the suspension was imposed. Instead, Dr. Rowles spoke with Dr. Tomlinson about the WC case and then reported his recollections to PQAC at the August 15 PQAC meeting. On September 3, Ms. Anyan, who is not a physician, had a telephone conversation with Dr. Tomlinson about the LH case. Ms. Anyan reported her recollections of this call to PQAC. Moreover, when Ms. Anyan made her report, she mistakenly implied that Dr. Tomlinson concluded that Dr. Smigaj provided substandard care to LH. Dr. Tomlinson's written reports on LH and WC were not received until September 9, six days after the suspension had been imposed.
¶ 67 Not only did PQAC fail to arrange for a conference call or meeting with Dr. Tomlinson about WC and LH, PQAC also apparently made no effort to obtain Dr. Tomlinson's written reports in a timely manner. Dr. Tomlinson completed his report on the WC case on August 26 and his report on LH on September 3, Through the use of an e-mail, fax, or conference call, PQAC could have obtained this information in a timely manner directly from Dr. Tomlinson.
¶ 68 In Cowell, the court considered the applicability of HCQIA immunity where a peer review committee suspended, and then terminated, a physician's privileges. In its examination of the second element, the court concluded that under HCQIA, Dr. Cowell was entitled to a reasonable investigation, but not a perfect investigation. Cowell, 153 Wash.App. at 932, 225 P.3d 294 (quoting Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 43, (1st Cir.2002)). Here, it was reasonable for PQAC to obtain external review of the JA, WC, and LH cases. But the failure of PQAC to take steps to obtain Dr. Tomlinson's opinions relating to WC and LH directly and accurately was unreasonable.
¶ 69 In Morgan, the court identified inadequacies in the hospital's investigation, including the failure to conduct interviews of other doctors, patients, and hospital employees. Morgan, 101 Wash.App. at 770, 14 P.3d 773. Ultimately, the court held that Dr. Morgan waived his right to complain by failing to cooperate with the investigation. Id. at 771, 14 P.3d 773.
¶ 70 PQAC did not interview any of Memorial's nurses or physicians. And notably, PQAC did not interview Dr. Harrington, the ob/gyn department chair. PQAC also did not investigate the disruptive physician reports concerning Dr. Smigaj. In Perry v. Rado, the court found reasonable fact finding occurred where there was a 12-month investigation, physicians and staff were interviewed, and Dr. Perry was allowed to make statements. Perry v. Rado, 155 Wash.App. 626, 639-40, 230 P.3d 203, review denied, 169 Wash.2d 1024, 238 P.3d 503 (2010).
¶ 71 We conclude that a reasonable jury could conclude that Dr. Smigaj has demonstrated, by a preponderance of the evidence, that Memorial has not made a reasonable effort to obtain the facts. Here, Dr. Smigaj has shown that PQAC's failure to obtain timely written reports from Dr. Tomlinson, or to at least interview him by conference call, and PQAC's failure to interview hospital physicians and nurses, and the chair of the hospital's ob/gyn department, constituted an unreasonable investigation under the circumstances.

ELEMENT 3
¶ 72 The third element of HCQIA inquires whether the physician receive adequate notice and procedures "or after such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). This element can be met by fulfilling this requirement or by demonstrating one of the two exceptions contained in 42 U.S.C. § 11112(c), Memorial argues that it meets both the investigation exception and *335 the imminent danger exception. We address the exceptions first. Memorial has the burden of proof.
¶ 73 Investigation Exception. The investigation exception contained in 42 U.S.C. § 11112(c)(1)(B) applies to suspensions of 14 days or less if "an investigation is being conducted to determine the need for a professional review." Dr. Smigaj's suspension was 11 days.
¶ 74 However, while PQAC completed the investigation of Dr. Smigaj on September 3, 2008, there are no facts indicating that the investigation continued after PQAC made its recommendation. Memorial fails to show that the investigation exception applies.
¶ 75 Imminent Danger Exception. Memorial also contends that the imminent danger exception applies. This exception permits the immediate suspension of clinical privileges where the failure to take such action "may result in an imminent danger to the health of any individual," 42 U.S.C. § 11112(c)(2). A suspension based on imminent danger does not require that imminent danger must exist, but, rather, that danger may exist if the suspension is not imposed. Sugarbaker v. SSM Health Care, 190 F.3d 905, 917 (8th Cir.1999) (rejecting claim that imminent danger did not exist because physician had no patients in the hospital when the suspension was imposed) (quoting Fobbs v. Holy Cross Health Sys. Corp., 29 F.3d 1439, 1443 (9th Cir.1994), overruled in part on other grounds by Daviton v. Columbia/HCA Healthcare Corp., 241 F.3d 1131 (9th Cir. 2001)).
¶ 76 At its September 3, 2008, meeting, PQAC approved a motion stating that Dr. Smigaj's continued practice constituted "unacceptable risk" to patients and recommending a precautionary suspension. CP at 656.
¶ 77 Dr. Smigaj's precautionary suspension was based primarily on three cases. While it is true that Dr. Tomlinson found nothing wrong with two of these cases, Dr. Tomlinson did find that Dr. Smigaj provided substandard care in one respect in the JA case. This first case dealt with a patient who was seen in February 2008. The JA case was presented at the May 30 PQAC meeting. The WC case, which resulted in infant death, was presented at PQAC's August 15 meeting. The LH case involved a patient who was seen in June. This case was also presented at the August 15 meeting.
¶ 78 A number of facts preclude a determination of imminent danger. PQAC's recommendation was based on its conclusion that failure to act may result in unacceptable risk or imminent danger to patients. But PQAC did not act in a manner that suggested an imminent danger. LH was seen in June; the case was presented to PQAC on August 15, but Ms. Anyan did not call Dr. Tomlinson or send him records until September 2; PQAC recommended Dr. Smigaj's suspension at the September 3 meeting. Similarly, the records on the WC case were sent to Dr. Tomlinson on August 8, the case was presented to PQAC on August 15, and the recommendation for the suspension was made on September 3. The matter was heard by MEC at its regularly scheduled September 16 meeting.
¶ 79 Memorial argues that PQAC reasonably believed that the failure to impose a precautionary suspension on Dr. Smigaj might result "in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(2), But this is not the standard. We must apply an objective standard when considering the imminent danger exception. Memorial has not met its burden to show that the imminent danger exception applies.
¶ 80 Fair Process. The failure to provide a physician with adequate notice and fair procedures precludes immunity under 42 U.S.C. § 11112(a)(3). Under this provision, "a professional review action must be taken... after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." Id. (emphasis added). Generally, "a physician is entitled to proper notice of a proposed peer review action and a fair hearing in which he or she can challenge the proposed action." Perry, 155 Wash.App. at 640, 230 P.3d 203. However, informal review procedures may be adequate to satisfy HCQIA. See Morgan, *336 101 Wash.App. at 772 n. 4, 14 P.3d 773; Cowell, 153 Wash.App. at 936, 225 P.3d 294.
¶ 81 The requirements for adequate notice and hearing are set forth in 42 U.S.C. § 11112(b). With this provision, HCQIA establishes a "safe harbor" provision that contains a list of procedural guidelines which, if followed, will satisfy the adequate notice and procedures requirement of 42 U.S.C. § 11112(a)(3). Chalal v. Nw. Med. Ctr., Inc., 147 F.Supp.2d 1160, 1173-74 (N.D.Ala.2000).
¶ 82 A professional review body need not meet all of the safe harbor requirements contained in 42 U.S.C. § 11112(a)(3). 42 U.S.C. § 11112(b). If other procedures are followed of a different character than those contained in 42 U.S.C. § 11112(b), the test of adequate notice and hearing procedures may be proved under the circumstances. Chalal, 147 F.Supp.2d at 1174. Dr. Smigaj was not given a hearing; thus, this court must consider whether the procedures used were fair to Dr. Smigaj under the circumstances.
¶ 83 As with the other elements considered here, Dr. Smigaj must show that a reasonable jury could conclude by a preponderance of the evidence that she failed to receive adequate notice and hearing under the circumstances. Cowell, 153 Wash.App. at 926, 225 P.3d 294.
¶ 84 The informal procedure process used here failed to provide Dr. Smigaj with adequate hearing and notice. Memorial failed to inform Dr. Smigaj that PQAC was considering or recommending the suspension of her hospital privileges. No one informed Dr. Smigaj that suspension was being considered until Dr. Padilla called her to tell her that her privileges were suspended. PQAC also failed to give her notice of several allegations that were being considered by PQAC. Dr. Smigaj was not present during any of the calls with Dr. Tomlinson and, also, she did not receive two of his reports in a timely manner. Dr. Smigaj was not invited to the PQAC meeting and was not present when Dr. Padilla signed the letter issuing her suspension.
¶ 85 Dr. Padilla wrote a letter to Dr. Smigaj informing her of the suspension. The letter explained that the matter would be considered at MEC's September 16 meeting and that she could make a statement, but that she could not bring an attorney, and that she was not entitled to hearing rights.
¶ 86 Dr. Smigaj also argues that PQAC's process was not fair because her competitorsDr. Rowles, Dr. Olden, and Dr. Nathaniel Davenportserved on PQAC as decision makers. Under 42 U.S.C. § 11112(b)(3)(A)(i), (ii), and (iii), any hearing must be conducted by an arbitrator, a hearing officer or panel of individuals, who are not in direct competition with the physician. Because the process made available to Dr. Smigaj did not include neutral decisionmakers, it was not fair under the circumstances. HCQIA anticipates a hearing officer or panel "not in direct economic competition with the physician involved." 42 U.S.C. § 11112(b)(3)(A)(ii), (iii).
¶ 87 Because Memorial failed to give Dr. Smigaj proper notice of the proposed peer review action, failed to allow her to attend the September 3 meeting, and failed to provide her with procedural safeguards, Memorial failed to provide fair process under 42 U.S.C. § 11112(a)(3) and 42 U.S.C. § 11112(b).
¶ 88 Dr. Smigaj has established, by a preponderance of the evidence, that PQAC's process was unfair under the circumstances.

ELEMENT 4
¶ 89 The fourth element requires Dr. Smigaj to rebut the presumption that Memorial acted with the reasonable belief that the suspension was warranted based on the facts that were known. The evidence here supports the presumption that Memorial reasonably believed that the suspension was warranted.
¶ 90 Attorney Fees and Costs. RCW 7.71.030(3) provides for the award of fees to a prevailing party. RCW 7.71.020 adopted 42 U.S.C. § 11113 that provides for an award of attorney fees and costs to a substantially prevailing defendant covered by HCQIA who met the elements of 42 U.S.C. § 11112(a) and where the claim or the claimant's conduct during the litigation of the claim was frivolous, unreasonable, without *337 foundation, or in bad faith. We review an award of attorney fees for an abuse of discretion. Cowell, 153 Wash.App. at 942, 225 P.3d 294.
¶ 91 The trial court awarded attorney fees to Memorial in the amount of $534,415. The trial court awarded attorney fees under RCW 7.71.030(3) and, alternatively, under 42 U.S.C. § 11113. In its findings, conclusions and judgment on attorney fees, the court concluded that all of Dr. Smigaj's claims were unfounded and unreasonable. We reverse the award of attorney fees to Memorial.
Conclusion. We conclude that RCW 7.71.020, the HCQIA, applies here because the professional review action related directly to Dr. Smigaj's competence and conduct. Dr. Smigaj has established that Memorial is not entitled to immunity under HCQIA. Dr. Smigaj has rebutted the presumptions granted under element 2, reasonable investigation, and element 3, fair process. The court did not err by dismissing her defamation claim relating to the Group Health letter, but the court erred in dismissing her remaining claims. The court erred by awarding attorney fees to Memorial.
¶ 92 We reverse the grant of summary judgment in favor of Memorial, reverse dismissal of all claims except the defamation claim relating to Group Health, and reverse the award of attorney fees. We remand for trial. We deny attorney fees on appeal.
WE CONCUR: KORSMO and SIDDOWAY, JJ.
NOTES
[1] HCQIA is codified as 42 U.S.C. §§ 11101-11152. The Washington legislature adopted HCQIA in RCW 7.71.020.
[2] RCW 7.71.020 reads as follows: "Pursuant to P.L. 99-660 Sec. 411(c)(2), Title IV of that act shall apply in Washington state as of July 26, 1987."